# ILLINOIS OFFICIAL REPORTS

## Appellate Court

*Yellow Book Sales & Distribution Co. v. Feldman*, 2012 IL App (1st) 120069

| | |
|---|---|
| Appellate Court Caption | YELLOW BOOK SALES AND DISTRIBUTION COMPANY, INC., Plaintiff-Appellee, v. DAVID FELDMAN, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-12-0069 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | September 27, 2012<br><br>November 3, 2012<br>November 15, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant was personally liable as the guarantor of his corporation's obligations for the advertising services provided by plaintiff, since defendant signed the contracts for those services, the contract language was identical, each included a clear statement that defendant would be "individually" liable, and further information was provided stating that the signatory would be personally liable, and, furthermore, defendant admitted that he was an attorney with an undergraduate degree in economics, he had 10 years' experience in running a company, he continued signing contracts for plaintiff after being placed on notice of the personal suit against him, and he did not attempt to add language that his guarantee was limited to his role as president of the corporation. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-M1-123590; the Hon. Sheryl A. Pethers, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on                Edward W. Feldman, of Miller, Shakman & Beem, LLP, of Chicago, for
Appeal                    appellant.

                          Tamara M. Paulun, of Teller, Levit & Silvertrust, P.C., of Chicago, for
                          appellee.


Panel                     JUSTICE FITZGERALD SMITH delivered the judgment of the court,
                          with opinion.
                          Presiding Justice Lavin and Justice Pucinski concurred in the judgment
                          and opinion.

**OPINION**

¶ 1      This is a collection case, arising from several contracts entered into by the plaintiff,
Yellow Book Sales and Distribution Company, Inc. (Yellow Book), and the defendant, David
Feldman (Feldman). As president of Glassworks, Inc. (Glassworks), Feldman negotiated and
signed four contacts for advertising services with Yellow Book. On each occasion, Feldman
signed the contracts with his name, followed, by "President" or "Pres." When Glassworks
went out of business and failed to pay the remaining balance owed on the four contracts,
Yellow Book sued Feldman as the purported guarantor. Following a bench trial, the court
found Feldman personally liable under the guarantee. The parties then stipulated to the
judgment amount ($13,178.01). Feldman now appeals, contending that the trial court's
finding that he intended to be bound personally under the guarantee was against the manifest
weight of the evidence. For the reasons that follow, we affirm.


¶ 2                                I. BACKGROUND

¶ 3      The record reveals the following pertinent facts and procedural history. On May 3, 2011,
Yellow Book filed a complaint against Feldman, alleging that he owed Yellow Book the
amount of $13,651.49 in damages, as guarantor on contracts Feldman had entered into on
behalf of Glassworks for advertising services between 2007 and 2009. In support of this
contention, Yellow Book attached copies of four contracts signed by Feldman on behalf of
Glassworks. These contracts were executed on December 5, 2007, May 14, 2008, December
11, 2008, and August 6, 2009.[1] All four documents are form contracts and contain identical

_____

[1]We note that the record is not properly marked and contains numerous other contracts, so
that it would be impossible to tell from the record alone which contracts are actually in dispute.
However, the parties have stipulated in their supplemental record on appeal that the four contracts
dated December 5, 2007, May 14, 2008, December 11, 2008 and August 6, 2009, are, in fact, the
only contracts at issue in this case and that, as such, they were introduced at trial as plaintiff's

language. Each contract clearly states that the contracting parties are Yellow Book and its "Customer," Glassworks, but each is signed by Feldman. The contracts are two-sided, with the back side containing boilerplate language in fine print. The bottom right of the front side of each form contract has a three-line signature block, written in fine print. It contains the following language:

**THIS IS AN ADVERTISING CONTRACT BETWEEN YELLOW BOOKS SALES AND DISTRIBUTION COMPANY, INC. OR YP TEL. AND**

_____ and
Print Customer Name

x_____
**Authorized Signature individually and for the Customer**. (Read Paragraph 14G on the reverse hereof) Title

_____
Print Signer's Name  Date

¶4     Each of the four contracts contain "Glassworks, Inc." above the "Print Customer Name" line. Feldman's signature appears on the second line of each contract and his name is followed by either "Pres." or "President." Feldman's name is printed on the following line.

¶5     Paragraph 14G of the form contracts, referred to in the signature block and found on the back side, is written in fine print and states:

"The signer agrees that he/she has the authority and is signing this agreement (1) in his/her individual capacity, (2) as a representative of the Customer, and (3) as a representative of the entity identified in the advertisement or for whose benefit the advertisement is being purchased (if the entity identified in the advertisement is not the same as the Customer or the signer). By his/her execution of this agreement, the signer personally and individually undertakes and assumes, jointly and severally with the Customer, the full performance of this agreement, including payment of amounts due hereunder."

¶6     After Feldman answered Yellow Book's complaint denying the allegations therein, the parties both filed pretrial briefs with the circuit court. In its brief, Yellow Book asked the circuit court to hold that the contract was enforceable as written as a matter of law, and that Feldman should not be allowed to introduce any extrinsic evidence as to the parties' intent. Yellow Book sought that the court apply the "four corners" doctrine and uphold the contract against Feldman simply on the basis of his signature. Feldman, on the other hand, argued in his brief that the contract was ambiguous as written and that he should therefore be permitted to testify regarding the parties' intent.

¶7     The circuit court agreed with Feldman and found, as a matter of law, that the contract was ambiguous as to whether Feldman intended to bind himself personally to the corporate obligations because he had written his corporate title (*i.e.*, "President" or "Pres.") next to his signature. The circuit court further found that a trial was necessary to determine whether

exhibit Nos. 1 through 4.

Feldman intended to be personally bound by the contract. The court noted it would hear testimony "about the parties' intent" and "who thought what."

¶ 8    In coming to this decision the circuit court explained:

"If Yellow Book wants this thing to be, you know, upheld in Illinois courts over and over again, the least they could do is not have the person put their title next to it. That would help.

I don't know that that would help every Illinois court, because it's certainly within Yellow Book's power to to putting [*sic*] great big letters, this is a personal guarantee, and have the person sign twice. And then there would be no factual dispute as to liability, and that's totally within Yellow Book's control.

* * *

And it looks to me so much like Yellow Book is trying to bury this in an interesting way that might appeal to judges. It's like a game. And I don't think personal guarantees should be a game."

¶ 9    During the bench trial, the parties offered testimony of several witnesses. First, Yellow Book paralegal Tasha Drew identified the four contracts at dispute in this litigation as plaintiff's exhibit Nos. 1 through 4.[2] She testified that all four contracts were standard Yellow Book advertisement contracts. Drew also identified exhibit No. 5 as Yellow Book's customer contact log for Glassworks. She testified that the contact log contained no complaints regarding the charges on the Glassworks account, nor anything to indicate that Feldman called into the Yellow Book offices disputing his individual liability on the account.

¶ 10    Drew explained that the Glassworks account was sent to a collection agency on July 29, 2010, and then to collection law firm on October 1, 2010, after Glassworks failed to pay the amounts it owed on the four contracts. She testified, however, that after the claim was placed with the collection agency and the collection law firm, Feldman signed another contract on behalf of Glassworks on November 16, 2010. That contract was entered into evidence as plaintiff's exhibit No. 6. According to Drew, this contract was paid in full at the time it was signed. In that way, it differed from the four contracts in dispute, which were to be paid on a monthly basis. Drew explained that Yellow Book's policy was that if a customer owed a balance on any account, in order to buy new advertisements and obtain a new contract, it needed to pay up front and in full. Drew could not state, however, whether it was Glassworks or Feldman personally who had paid the full balance on the November 16, 2010, contract.

¶ 11    Steven Sears, a sales consultant for Yellow Book, next testified that he has worked for Yellow Book since 2000. Sears averred that he was in charge of the Glassworks account for five years, but that Glassworks was a client of Yellow Book even before that. As part of his involvement in the Glassworks account, Sears met with Feldman about twice a year since 2000 (*i.e.*, about 10 times over the 5-year period).

---

[2]Plaintiff's exhibit No. 1 is the May 14, 2008, Yellow Book contract; plaintiff's exhibit No. 2 is the December 5, 2007, Yellow Book contract; plaintiff's exhibit No. 3 is the August 6, 2009, Yellow Book contract; and plaintiff's exhibit No. 4 is the December 11, 2008, Yellow Book contract.

¶ 12   Sears identified the four contracts which are in dispute in this litigation as plaintiff's exhibit Nos. 1 through 4. He testified that each time one of those contracts was signed he met with Feldman in person. Sears explained that he would fill out the contracts with the pricing and the requested advertisement information and then he would take the contracts to Feldman's office for Feldman's signature. Sears averred that Feldman was always given an opportunity to look over the contract before he signed it, and that he was always permitted to keep a copy of the contract for his own files. According to Sears, Feldman never made any comments to him objecting to any terms in any of the contracts.

¶ 13   On cross-examination, Sears admitted that he made certain notations in the signature box of each of the four contracts at issue. Specifically, Sears acknowledged that on each of the contracts, he handwrote "Glassworks, Inc.," above the line that states "Print Customer Name." He then circled the "x" in the following line, requiring the "Authorized Signature individually and for the Customer," prior to having Feldman sign his name next to that "x." Sears further admitted that he then added another "x" on the signature line of each of the four contracts, next to Feldman's signature, in order to show Feldman where he could write his title, because that was not on the preprinted form. According to Sears, Feldman then handwrote either "President" or "Pres." next to that second "x."[3]

¶ 14   On redirect examination, Sears identified plaintiff's exhibit No. 6 as the contract entered into between Yellow Book and Glassworks on November 16, 2010, after Glassworks had already failed to "make good" on the four contracts in dispute in this litigation. Sears acknowledged that Feldman signed that contract in his presence using an electronic pad, *i.e.*, a Dell laptop with a tablet that can be used for signatures. Sears testified that there is no title next to Feldman's signature on that contract (*i.e.*, no "President" or "Pres." following Feldman's name).

¶ 15   On re-cross-examination, Sears admitted that unlike the four contracts at issue, the first two of which were monthly payment installment contracts, the November 16, 2010, contract, was entered into on a "pay as you go basis," *i.e.*, a check for full payment on the contract was given to Sears on that same day by Jennie Cosantino, the bookkeeper for Glassworks.

¶ 16   The court next heard the testimony of Glassworks president and treasurer, David Feldman. Feldman explained that Glassworks is a full-service glass, mirror and shower door company that was started by the Harris family in 1977. Feldman began working for Glassworks in 1999, and then in 2000, together with Dean Harris, the Harris's son, he purchased the company from the Harrises. According to Feldman, since then, there have been only two principals in Glassworks, himself and Harris, who has acted as vice president and secretary. When Feldman purchased the company, it had 35 employees and 4 locations.

¶ 17   Feldman explained that prior to purchasing Glassworks, he worked as an attorney. He admitted that he has a bachelor's degree in economics, as well as a juris doctorate, which he

---

[3]With respect to the May 14, 2008, contract, Sears also explained that in addition to his signature in the signature box, Feldman also signed his name on the lower left corner of the contract next to the line authorizing "monthly payments from above," and included an American Express account number in the provided space.

obtained in 1985 from the University of Illinois.

¶ 18    Feldman next averred that Glassworks was forced to cease business operations and file an assignment for benefit of creditors in February 2011. Feldman explained that "under Illinois law, [this] is sort of like a form of bankruptcy ***, a common law bankruptcy." According to Feldman, Glassworks halted operations in 2011 because a third of its revenue came from new construction, and beginning in 2009 the company became enveloped in the housing crisis. The company went from 4 locations to 1 and from 35 employees to 18, and Feldman began looking for equity investors to either invest in it or buy its assets. Eventually, Feldman and Harris were forced to sell Glassworks through the assignment of beneficial creditors process. Since then, Feldman has returned to private practice as an attorney, and he now works for the Northbrook law firm of Strauss and Malk.

¶ 19    Feldman next testified regarding his responsibilities as president and treasurer of Glassworks. He averred that he was generally responsible for the "inside operations" of the business, such as handling relationships with creditors, vendors and customers, scheduling employees, ordering products, dealing with banks, and otherwise running the day-to-day affairs of the corporation. Feldman was also responsible for signing all contracts on behalf of Glassworks.

¶ 20    Feldman testified that his regular practice in signing any contract on behalf of the corporation was to place the name of the entity, Glassworks, on the contract, and then sign his name, comma, "Pres." or "President" next to that, where the contract did not include the exact words for the corporate identification on the signature line. Feldman explained that he signed in this manner because he wanted it to be known that he was signing as the head officer, *i.e.*, the president of Glassworks.

¶ 21    Feldman was next asked whether there were any circumstances in which he knowingly undertook a personal obligation or guarantee in connection with a business contract at Glassworks. He responded that in the 11 years that he was with Glassworks, there were several times when he was asked by a vendor or a bank to personally guarantee a contract or a loan. He explained that in each of those situations, he made the decision on a case-by-case basis. For example, Feldman recalled that he agreed to be the personal guarantor for Glassworks' credit line taken from WaMu Bank in 2007. He testified that in this situation, however, the bank required him to provide two separate signatures in the credit contract, one under the corporation name and then a separate one for just Feldman, making it clear that they were asking him to give a personal guarantee, and asking him to sign in his personal capacity.[4]

¶ 22    Feldman also recalled situations in which he refused a vendor's request to act as a personal guarantor on a Glassworks' contract. For example, two of Glassworks' larger vendors, Consolidated Glass and Torison Glass, asked Feldman to act as personal guarantor in order to begin doing business with Glassworks, but Feldman refused.

¶ 23    Feldman next testified regarding Glassworks' relationship with Yellow Book. He

---

[4]In support of this contention, Feldman introduced into evidence, as defendant's exhibit No. 1, a copy of the WaMu streamlined business credit application and agreement.

explained that Glassworks was a customer of Yellow Book since 2000 and that, as part of his responsibilities as president of Glassworks, he negotiated contracts with Steven Sears for advertisements with Yellow Book. Feldman testified that it was standard practice for Sears to come to his office and present him with the type of advertisements that Glassworks could use. The two would negotiate the price, and Sears would then fill out the standard Yellow Book contract with the negotiated items and then return it to Feldman to sign. Feldman would meet Sears about twice a year.

¶ 24    Feldman testified that all of the contracts he entered into with Yellow Book on behalf of Glassworks, save for the last one entered on November 16, 2010, were paper contracts that Sears would fill in by hand, and then have Feldman sign. Feldman admitted that it was standard practice for Sears to leave him a copy of the contract, and that he retained copies of all of those contracts in Glassworks' files. According to Feldman, if the particular contract required immediate payment, he would give Sears the number of Glassworks' corporate American Express card or he would have his bookkeeper, Jennie Cosantino, "cut Sears the first check required on any installment."

¶ 25    Feldman testified that at no point in their communication did Sears ever tell him that he intended Feldman to be personally bound by the contracts he was signing. In fact, according to Feldman, Sears in no way indicated that there was even a potential for personal liability. Sears never asked Feldman to sign the contracts twice, once as president and then separately in an individual capacity; nor did he ever direct Feldman's attention to any particular provision of the contract or ask Feldman to read the back and fine print. Feldman was also never asked to, nor did he, make any payments to Yellow Book from his personal checking or credit card accounts. Therefore, according to Feldman, he had no reason to believe that he could be construed as a personal guarantor on any of the Yellow Book contracts.

¶ 26    Feldman also testified that sometime in 2003 or 2004, Sears, who knew Feldman was an attorney, asked him why he always signed "President" after his name. Feldman told Sears that he did so in order to state that he is the president of Glassworks.

¶ 27    Feldman was next questioned regarding the four contracts in dispute in this litigation. He testified that when he signed those contracts, he never noticed the language under the signature line referring to his "individual" responsibility on the contract. Feldman also averred that he did not read the back and fine print of the contracts and therefore did not know that there was language in there purportedly personally binding him on the contracts.

¶ 28    Feldman next testified regarding the November 16, 2010, contract, which was the last contract he ever entered into with Yellow Book on behalf of Glassworks. He explained that this contract, unlike all the previous ones, was an electronic contract that he signed on Sears' computer. Feldman testified that at this time, as a result of the economy, Glassworks was falling behind on its Yellow Books account, and Sears continued to stop by his office asking to get paid. For about nine months, Feldman would have his bookkeeper, Jennie Cosantino, write Sears checks for amounts that Glassworks could spare. According to Feldman, at this point, Sears convinced him that Yellow Book did not want to lose Glassworks as a customer and that if he wanted to continue posting advertisements, the only thing Glassworks would have to do was to prepay on any future contracts. As a result, on November 16, 2010, when

Feldman signed the electronic contract, Glassworks paid the entire sum owed on the contract in advance using a corporate check.

¶ 29 When Feldman was asked why he did not place "President" next to his signature on this contract, Feldman explained:

"[T]his was a new fangled computer thing which there wasn't even a contract. [Sears] came with the thing and he said we have a new Dell computer, you're just supposed to sign here. And he showed me a little box, and I signed on the box."

Feldman also averred that this contract was different because it was paid in full in advance with a corporate check so there could be no future obligation for the corporation or him.

¶ 30 When asked whether he would nevertheless have been personally liable on this contract if Glassworks' check (paid in full and in advance) had bounced, Feldman answered in the negative. When asked to explain, he stated that he knew that there were sufficient funds in the Glassworks' checking account to pay for the amount in the check.[5]

¶ 31 After hearing the testimony of all the witnesses, and examining the plaintiff's exhibits entered into evidence, the circuit court found Feldman personally liable on the contracts. In doing so, the court first acknowledged that the contract "could be a lot more clear about the personal guarantee," but then found that because Feldman was a sophisticated person with a college degree and a law degree, he could not have been confused by the language of the contract but, rather, merely did not bother to read it. In coming to this conclusion, the court found relevant that Feldman had not only signed the four Yellow Book contracts in dispute, but numerous identical Yellow Book contracts beginning in 2000, which all contained identical language under his signature specifying that he would be "individually" liable on the contract and pointing him to paragraph 14, which explained the details of the personal guarantee. The court further found relevant that Feldman was always given copies of any contract he signed so that he had ample opportunity to read and review all the relevant language. The court also found relevant that Feldman had refused to be a personal guarantor on other contracts with other companies, thereby demonstrating that he knew the difference between corporate and individual liability. The court noted that Feldman should have crossed off the "individually" language in the signature box if he intended not to be personally liable

---

[5]We note that in addition to the aforementioned testimony, Feldman was also asked to identify several additional plaintiff's exhibits (Nos. 7, 8, and 9) that Yellow Book wanted entered into evidence. These exhibits were entered into evidence over Feldman's objection. Plaintiff's exhibit No. 7 is a set of copies of invoices that Yellow Book sent to Glassworks at its corporate address. During cross-examination, Feldman acknowledged that all of the invoices were addressed to Glassworks, but that his name appeared underneath the company's name. Plaintiff's exhibit Nos. 8 and 9 are two letters, the first dated October 4, 2010, and the second October 15, 2010, both addressed to Glassworks, and captioned "Yellow Book versus Glassworks, Inc., and Dave Feldman," notifying Feldman of an attorney's lien against him filed by a collection law firm hired by Yellow Book. These letters were both mailed to Feldman before he signed the last electronic contract between Yellow Book and Glassworks on November 16, 2010. Feldman admitted during trial that after he received the second letter, dated October 15, 2010, Glassworks submitted a payment to the collection law firm.

on the contract. Finally, the court found relevant that even after Yellow Book sent Feldman a notice of attorney's lien, suing Feldman personally on the delinquent contracts, Feldman signed another contract with Yellow Book, where he omitted his corporate title, "President." Accordingly, under all of the aforementioned circumstances, the circuit court concluded that Feldman was personally liable on the contract and ordered him to pay Yellow Book whatever amount Yellow Book could prove was due.

¶ 32    The parties subsequently stipulated to the judgment amount, and the circuit court entered judgment in favor of Yellow Book and against Feldman in the amount of $13,178.01. Feldman now appeals.

¶ 33                                II. ANALYSIS

¶ 34    On appeal, Feldman argues that the circuit court's finding that he intended to be personally bound under the contract was against the manifest weight of the evidence.

¶ 35    Before addressing any of Feldman's concerns, we begin by noting that Feldman's brief violates the requirements of Illinois Supreme Court Rule 341(h) (eff. Sept. 1, 2006). Rule 341(h)(6) requires that the statement of facts in an appellant's brief "contain the facts necessary to an understanding of the case, stated accurately and fairly without argument or comment, and with appropriate reference to the pages of the record on appeal." Ill. S. Ct. R. 341(h)(6) (eff. Sept. 1, 2006). In the present case, even though the central issue is the ruling of the trial court after a bench trial, Feldman presents few, if any, facts regarding what testimony was heard at that trial. In addition, the facts that are included in his brief are not stated accurately and fairly without argument or comment but, rather, are stated in such a manner that supports Feldman's contentions. Having noted these serious deficiencies in Feldman's brief, we admonish him that compliance with Illinois Supreme Court Rule 341 is not an inconsequential matter, and that, we, as the reviewing court, may dismiss an appeal for noncompliance with the aforementioned requirements. Nevertheless, for purposes of judicial economy and because the facts necessary to the understanding of the issues here raised are simple, as well as contained in the record below, we address the merits of this appeal. See *Zadrozny v. City Colleges of Chicago*, 220 Ill. App. 3d 290, 292-93 (1991).

¶ 36    In that respect, we begin by noting that we review the trial court's findings after a bench trial under a manifest weight of the evidence standard. *Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 12 ("Generally, the standard of review in a bench trial is whether *the order or judgment is against the manifest weight of the evidence.*" (Emphasis added.)); see also *Southwest Bank of St. Louis v. Poulokefalos*, 401 Ill. App. 3d 884, 890 (2010) ("On review of a bench trial, we will not disturb the trial court's findings of fact unless they are against the manifest weight of the evidence."). In doing so, we give "great deference to the trial court's findings because, as the trier of fact, the trial court is in a superior position to observe the witnesses while testifying, to judge their credibility and to determine the weight their testimony and other evidence should receive." *International Capital Corp. v. Moyer*, 347 Ill. App. 3d 116, 121 (2004). A reviewing court will not overturn a trial court's findings merely because it does not agree with the lower court or because it might have reached a different conclusion had it been the trier of fact. *Veco Corp.*

*v. Babcock*, 243 Ill. App. 3d 153, 161 (1993). Accordingly, we will find a judgment to be against the manifest weight of the evidence only if the opposite conclusion is apparent or when the trial court's findings appear to be arbitrary, unreasonable, or not based on the evidence. *International Capital*, 347 Ill. App. 3d at 121.

¶ 37    In the present case, Feldman argues that all the evidence presented at trial irrefutably evinces that he did not intend to be personally liable on the contract between Yellow Book and Glassworks. In that vein, Feldman points out that his uncontradicted testimony at trial established that he signed each of the four disputed contracts with his name, followed by "President" or "Pres." in an attempt to indicate that he was signing solely in his corporate capacity and that he did not intend to be personally bound on the contracts. Feldman further points out that he, in fact, informed Sears of this fact on at least one occasion. Feldman argues that instead of relying on his uncontradicted testimony, the trial court looked to the four corners of the agreement to find that the form language on the contract trumped Feldman's notation of "President." Feldman therefore contends that the trial court improperly construed the ambiguity in the contract against him rather than Yellow Book as the drafter of the contract and that, instead of considering Feldman's actual intent, it applied a negligence standard to find that Feldman just "did not bother to read the contract." For the reasons that follow, we disagree.

¶ 38    It is well established that an agent of a disclosed principal is not individually or personally bound by the terms of the contact which he executes on behalf of the principle, where the agency relationship is known to the other party at the time of the contracting, unless he agrees to be personally liable. See *Knightsbridge Realty Partners, Ltd-75 v. Pace*, 101 Ill. App. 3d 49, 53 (1981); see also *Western Casualty & Surety Co. v. Bauman Insurance Agency, Inc.*, 81 Ill. App. 3d 485, 486 (1980) (citing *Annes v. Carolan, Graham, Hoffman, Inc.*, 336 Ill. 542 (1929), *Dunlop v. McAtee*, 31 Ill. App. 3d 56 (1975), and *Grover v. Commonwealth Plaza Condominium Ass'n*, 75 Ill. App. 3d 500 (1979)); *Wottowa Insurance Agency, Inc. v. Bock*, 104 Ill. 2d 311, 315 (1984) ("[w]hen an officer signs a document and indicates next to his signature his corporate affiliation, then absent evidence to the contrary intent in the document, the officer is not personally bound"). The intent to be personally bound, however, need not be expressed but may also be inferred by implication reasonably drawn from all the facts and circumstances in evidence. *Knightsbridge Realty Partners*, 101 Ill. App. 3d at 53; see also *Western Casualty & Surety Co.*, 81 Ill. App. 3d at 486; *Wottowa Insurance Agency, Inc.*, 104 Ill. 2d at 316 ("where the language in the body of the document conflicts with the apparent representation by the officer's signature, an issue of fact as to the agent's intent arises, an issue for the [trier of fact] to determine").

¶ 39    In the present case, contrary to Feldman's contentions, the trial court weighed all the evidence in the record and concluded that the intent of the parties was that Feldman be personally liable on the contract. In finding so, the court pointed out that Feldman was a "sophisticated" individual, who had admitted to having both a college and a law degree, and who had been running the Glassworks business for over 10 years. The court noted that, as such, Feldman could not have been confused by the language underneath the signature line, which required, in bold letters, his "Authorized Signature *Individually* and for the Customer" (emphasis added), and then referred him to paragraph 14G, which unequivocally specified

-10-

that as the signor, he agreed that he was signing both in his "individual capacity" and as the "representative of the Customer," and that as such he was personally and individually undertaking the full performance of the agreement. The court further noted that the uncontradicted evidence at trial established that Feldman had not only signed the four Yellow Book contracts in dispute, but also numerous identical Yellow Book form contracts, all of which contained identical language specifying that he would be "individually" liable on the contract and pointing him to paragraph 14G, which explained the details of that personal guarantee. Also relevant to the court was the fact that over the 10-year period he interacted with Yellow Book, Feldman was always given a copy of any contract he signed so that he had ample opportunity to read and review all the relevant language. Feldman testified that he refused to be a personal guarantor on other contracts with other companies, which demonstrated to the court that Feldman knew the difference between corporate and individual liability. Finally, the court found relevant that even after Yellow Book sent Feldman a notice of attorney's lien, suing Feldman personally on the delinquent contracts, Feldman signed another contract with Yellow Book, where he omitted his corporate title, "President." Under all of the aforementioned unrefuted facts, the circuit court concluded that Feldman was personally liable on the contract.

¶ 40    After a review of the record, we find no basis to disturb the trial court's findings or to conclude that those findings are "arbitrary, unreasonable, or not based on the evidence." *International Capital*, 347 Ill. App. 3d at 122. The trial court was in the best position to observe Feldman testifying at trial, to judge his credibility and to determine the weight to give his testimony in light of all the testimony and exhibits presented at trial. *International Capital*, 347 Ill. App. 3d at 121.

¶ 41    Moreover, in coming to this conclusion, we find the federal district case of *Yellow Book USA, Inc. v. American Painting, Inc.*, No. 05 C 04615, 2007 WL 328855 (N.D. Ill. Feb. 1, 2007), to be directly on point. That case involved identical Yellow Book form contracts. Just as here, the front of the contracts contained a signature box with three lines: one which stated, " 'Print Company Name' "; one below it which stated " 'Authorized Signature Individually and for the Company (Read clause 14f on reverse side)' "; and one below that which stated, " 'Print Signer's Name /SS# (required for new accounts and new signer),' " and " 'Date.' " *American Painting, Inc.*, 2007 WL 328855, at *2. Just as here, the line which referred to the authorized signature and the reference to clause 14f was in bold-faced print, and on the reverse of the contract, clause 14f read: " 'The signer of this agreement does, by his execution personally and individually undertake and assume the full performance hereof including payments of amounts due hereunder.' " *American Painting, Inc.*, 2007 WL 328855, at *2.

¶ 42    In *American Painting, Inc.*, Yellow Book and American Painting entered into six contracts over a four-year period. *American Painting, Inc.*, 2007 WL 328855, at *2. These contracts were signed by Gary Bens, as the president of American Painting. *American Painting, Inc.*, 2007 WL 328855, at *2. Bens testified at trial that he never intended to be personally liable on the contracts, since everything he does for American Painting is solely in his "corporate capacity," and that he signed those contracts solely as president of American Painting. *American Painting, Inc.*, 2007 WL 328855, at *2.

¶ 43    After a bench trial to determine the intent of the parties, the federal district court determined that Bens was personally liable on the contracts. In doing so, the court first acknowledged that under Illinois law, if an officer of a corporation signs a guarantee with his corporate affiliation accompanying that signature, the officer is not personally bound to the guarantee absent evidence to the contrary. *American Painting, Inc.*, 2007 WL 328855, at *3 (citing *Wottowa Insurance Agency, Inc.*, 104 Ill. 2d 311). The court then went on to point to several factors that contradicted Bens' testimony that he should not be found personally liable on the contracts because he acted in his corporate capacity when he signed them. *American Painting, Inc.*, 2007 WL 328855, at *4. First, the court noted that Bens had an opportunity to review and read the contracts:

> "Although the agent for Yellow Book wrote the information on the contract regarding what type of ad, the location of the ad, and the cost of distribution, this was done during an interactive process wherein Bens provided information to the agent, input regarding the copy to be employed, and discussed the placement of the ad in various directories. During this interactive process, the agent for Yellow Book provided the final version of the contract to Mr. Bens for his review. He reviewed the ad contract and was given an opportunity to make any changes prior to signing." *American Painting, Inc.*, 2007 WL 328855, at *4.

¶ 44    Second, the district court noted that the plain language on the front of the contracts beneath the signature line clearly stated that the signatory would be "individually" liable for the contract. *American Painting, Inc.*, 2007 WL 328855, at *4. That language, according to the district court, was not hidden but, rather, was directly below the signature line and printed in bold-faced type letters, referring to the reverse side of the contract where "the signatory [was] given further information that he [would] be personally liable for the contract." *American Painting, Inc.*, 2007 WL 328855, at *4. According to the district court:

> "Bens was an articulate witness with three years of college education ***. There was no evidence that Bens did not understand what he was doing, that there was an uneven bargaining position, or that Bens was confused about signing the contract. Bens also returned to YellowBook on over six occasions to post his ads which reflects his apparent satisfaction with his dealings with YellowBook and the product they were supplying him." *American Painting, Inc.*, 2007 WL 328855, at *4.

¶ 45    In addition, the district court found relevant that Bens was provided with a copy of the six contracts at the completion of each negotiation session, so that over the course of four years, he had the same contact with the same personal guarantee language available to him for review. *American Painting, Inc.*, 2007 WL 328855, at *4.

¶ 46    Furthermore, the district court noted that after Bens was sued for the unpaid balances on the contracts, he continued to order ads and to pay for them even after being placed on notice that he would be held both "personally and professionally liable." *American Painting, Inc.*, 2007 WL 328855, at *5. According to those postdispute contracts, Bens did not attempt to cross out the language of the personal guarantee or add language that limited his guarantee to his corporate role. *American Painting, Inc.*, 2007 WL 328855, at *4. Under all of the foregoing facts, the federal district court concluded that the evidence presented at trial

established that Bens was personally liable on the contracts. *American Painting, Inc.*, 2007 WL 328855, at *4.

¶ 47 The facts of *American Painting, Inc.* are nearly identical to the facts in this case. As elaborated above, just as in *American Painting, Inc.*, here, Feldman was given copies of all of the Yellow Book contracts and had ample opportunity to review them. The language of the contracts was identical, clearly stating in bold font that the signatory would be "individually" liable for the contract, and referring to the reverse side where the signatory was given "further information indicating that he [would] be liable personally for the contract." *American Painting, Inc.*, 2007 WL 328855, at *4. What is more, just as Bens was an articulate witness with three years of college education, in the present case, Feldman admitted that he is attorney with both a law degree and an undergraduate degree in economics, as well as a businessman with over 10 years of experience running a company. Finally, just like Bens, Feldman continued to sign contracts with Yellow Book even after he was placed on notice of the personal suit against him, and in doing so, did not attempt to cross out the language of the personal guarantee or add language that limited his guarantee to his corporate role. As in *American Painting, Inc.*, we too find that Feldman, just as Bens, should be held personally liable on the contracts. See *American Painting, Inc.*, 2007 WL 328855, at *3-5.

¶ 48 In coming to this decision, we have reviewed the cases of *Kankakee Concrete Products Corp. v. Mans*, 81 Ill. App. 3d 53 (1980), and *Addison State Bank v. National Maintenance Management, Inc.*, 174 Ill. App. 3d 857 (1988), cited to by Feldman and find them inapposite. The holdings of both of these cases were governed by section 3-403(3) of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1987, ch. 26, ¶ 3-403), which is not applicable to the cause at bar. That section provides that: "the name of an organization preceded or followed by the name and office of an authorized individual is a signature made in a representative capacity." Ill. Rev. Stat. 1987, ch. 26, ¶ 3-403(3). In the present case, Feldman cannot in good conscience attempt to argue that this section of the UCC applies to the advertisement contracts entered into between him on behalf of Glassworks and Yellow Book. Nevertheless, he argues that the aforementioned cases underline important public policy concerns expressed in the UCC that should be applied to his cause and that would have required the trial court to consider his testimony regarding his intent not to be personally bound on the contracts dispositive. As already noted, however, the trial court did, in fact, consider all of Feldman's testimony and, in light of the remaining evidence introduced at trial, found his statement that he did not intend to be personally liable on the contracts incredible. See *International Capital Corp.*, 347 Ill. App. 3d at 121 (we will not reverse a judgment of the trial court unless it is against the manifest weight of the evidence, *i.e.*, the opposite conclusion is apparent or the trial court's findings appear to be arbitrary, unreasonable, or not based on the evidence).

¶ 49 For these same reasons, we reject Feldman's argument that similar public policy concerns underlying the suretyship provision of the statute of frauds evince "legislative [intent] that reasonable clarity and certainty should exist before a person is held personally chargeable for the debt or obligation of another," and mandate our reversal of the trial court's judgment. In that respect, we further note that the suretyship provision of the statute of frauds is

inapplicable to the case at bar since it applies only to instances where one party agrees to be responsible for the debt or obligations of another. See, *e.g.*, *Malkov Lumber Co. v. Wolf*, 3 Ill. App. 3d 52, 55-56 (1971) ("Defendant urges that the Statute of Frauds, [citation], bars plaintiff's claim. This contention is without merit. Plaintiff's claim is predicated upon Forman's personal liability and not upon an undertaking by him to be responsible for another's debt or undertaking. Therefore by the terms of the statute itself it is not applicable.").

¶ 50                                    III. CONCLUSION

¶ 51        For all of the aforementioned reasons, we affirm the judgment of the circuit court.

¶ 52        Affirmed.