# Illinois Official Reports

## Appellate Court

---

*Marque Medicos Archer, LLC v. Liberty Mutual Insurance Co.*,
2018 IL App (1st) 163350

---

| | |
|---|---|
| Appellate Court Caption | MARQUE MEDICOS ARCHER, LLC, and MEDICOS PAIN & SURGICAL SPECIALISTS, S.C., Plaintiffs-Appellants, v. LIBERTY MUTUAL INSURANCE COMPANY and MORSE AUTOMOTIVE CORPORATION, Defendants-Appellees. |
| District & No. | First District, Second Division<br>Docket No. 1-16-3350 |
| Filed | June 26, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 13-L-13456; the Hon. Patrick J. Sherlock, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Alan J. Mandel and Antonio D. Flores, of Alan J. Mandel, Ltd., of Skokie, for appellants.<br><br>John F. Boyle and Cathleen M. Hobson, of Law Offices of Meachum, Boyle & Trafman, of Chicago, for appellees. |
| Panel | PRESIDING JUSTICE MASON delivered the judgment of the court, with opinion.<br>Justices Pucinski and Hyman concurred in the judgment and opinion. |

**OPINION**

¶ 1    This case arises out of defendant-appellant Liberty Mutual Insurance Company's (Liberty) alleged failure to fully pay plaintiffs-appellees, Marque Medicos Archer, LLC, and Medicos Pain & Surgical Specialists, S.C. (collectively, the providers), for services they rendered to an injured employee of codefendant-appellant, Morse Automotive Corporation (Morse Automotive).[1] The trial court dismissed with prejudice the providers' claims for breach of contract and violation of section 8.2(d)(3) of the Workers' Compensation Act (Act) (820 ILCS 305/8.2(d)(3) (West 2012)) against Liberty and violation of the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 2012)) against both defendants, and the providers appeal. Because we conclude that the providers have no direct cause of action against Liberty for its delay in paying medical bills, we affirm.

¶ 2                                        BACKGROUND

¶ 3    The providers first filed suit against Liberty and Morse Automotive on November 15, 2013. In their second amended complaint, at issue here, they alleged that between August 29, 2009, and November 17, 2011, they treated Ernesto Martinez for injuries he suffered while employed by Morse Automotive. At the outset of Martinez's treatment, he authorized payment to be made directly to the providers for insurance benefits payable to him. The providers billed Morse Automotive for the services they rendered to Martinez by submitting claims to Liberty, who issued Morse Automotive's workers' compensation insurance policy. The medical providers alleged that Liberty was the disclosed agent for Morse Automotive.

¶ 4    The providers alleged that all workers' compensation policies issued in Illinois include a promise by the insurer to pay "promptly" the benefits required of the employer under the Act as well as "interest on a judgment as required by law until [the insurer] offer[s] the amount due under this insurance." All policies further include a provision that the insurer is "directly and primarily liable to any person entitled to the benefits payable by this insurance," and those persons "may enforce our duties *** against us or against [the employer] and us."

¶ 5    Notwithstanding this policy language, the complaint alleged that Liberty failed to promptly pay bills for medical services rendered to Martinez or, to a large extent, at all. The providers alleged that a market conduct examination conducted by the Illinois Department of Insurance in 2013 of Liberty's claim payment history between July 1, 2011, to June 30, 2012, found that Liberty failed to pay interest on adequately documented medical provider bills not paid within 30 days of receipt and was in violation of section 8.2(d)(3) of the Act.

¶ 6    As a result of the market conduct examination, on December 12, 2013, Liberty entered into a stipulation and consent order in which it warranted to the Department of Insurance in relevant part that it would "[i]nstitute and maintain procedures whereby [Liberty] pays interest on

_____

[1]This case is related to *Marque Medicos Farnsworth, LLC v. Liberty Mutual Insurance Co.*, 2018 IL App (1st) 163351, also decided today, in which Marque Medicos Farnsworth and Medicos Pain & Surgical Specialists, S.C., alleged that Liberty failed to fully pay for services the providers rendered to an injured employee of a different corporation. Because the causes of action asserted by the providers and dismissed by the trial court are not identical and because the parties did not move to consolidate the cases, we decide them separately.

adequately documented health care provider bills not paid within thirty (30) days of receipt as required by 820 ILCS 305/8.2(d)(3)."

¶ 7 In the meantime, in September 2009, Martinez timely filed a claim before the Illinois Workers' Compensation Commission (IWCC) for disability benefits and medical expenses. A little over two years later, on December 14, 2011, Martinez entered into a settlement agreement with Morse Automotive. The settlement agreement names Martinez as petitioner, Morse Automotive as respondent, and Liberty as "[r]espondent's insurance or service company." The terms of the settlement provided that respondent would pay petitioner $163,000 in a lump sum for "full and final settlement of all claims for benefits past, present and future based on injuries arising out of an accident on or about August 4, 2009"; the lump sum included $41,751 for future medical expenses. The settlement further provided "[r]espondent will pay all necessary and related medical expenses pursuant to the fee schedule or negotiated rate, whichever is less, that have been submitted to [r]espondent prior to contract approval and that contain all the required data elements necessary to adjudicate the bills pursuant to Section 8.2(d)." The settlement agreement was silent on the amount of medical bills outstanding as of the date of its execution. The complaint did not allege, and the record does not disclose, that prior to the settlement, Liberty ever took the position that all or any portion of the medical expenses reflected in the bills sent to it were not necessary or related to Martinez's injuries or that the documentation in the bills was insufficient.

¶ 8 As of the date of the settlement agreement, neither Morse nor Liberty had paid any of the providers' bills, but approximately six months after the settlement was approved by the IWCC, Liberty made partial payments to the providers for bills it received between 2009 and 2011. Approximately $39,000 in bills is still outstanding. And as of the date of the complaint, over $36,000 of interest had accrued on the unpaid bills as well as the bills paid after the statutory grace period had elapsed.

¶ 9 On June 5, 2014, Martinez executed a specific assignment in favor of the providers to pursue any and all of his rights and claims arising out of the settlement agreement.

¶ 10 Based on these allegations, the second amended complaint alleged four counts against both defendants: (1) breach of contract (based on the settlement agreement), (2) breach of contract implied in fact (in the alternative), (3) violation of section 8.2(d)(3) of the Act (820 ILCS 305/8.2(d)(3) (West 2012)), and (4) violation of the Consumer Fraud Act (815 ILCS 505/1 *et seq.* (West 2012)); one count was alleged only against Liberty, namely, violation of section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2012)).

¶ 11 The defendants filed a motion to dismiss the complaint pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2012)). Ultimately, the trial court dismissed with prejudice the providers' claims for (1) breach of contract against Liberty based on the fact that the providers failed to allege that Liberty was a party to the settlement agreement, (2) violation of section 8.2(d) of the Act against Liberty only, and (3) violation of the Consumer Fraud Act against both defendants. The providers voluntarily dismissed their remaining claims (with leave to reinstate) to pursue this appeal.

¶ 12 ANALYSIS

¶ 13 A motion to dismiss under section 2-615 challenges the legal sufficiency of the complaint based on defects apparent on its face. *Simpkins v. CSX Transportation, Inc.*, 2012 IL 110662, ¶ 13. We must construe the allegations of the complaint in the light most favorable to the

plaintiff and determine whether they state a cause of action upon which relief can be granted. *Bogenberger v. Pi Kappa Alpha Corp.*, 2018 IL 120051, ¶ 23. In making this determination, all well-pleaded facts, and all reasonable inferences drawn from those facts, are taken as true. *Ferris, Thompson & Zweig, Ltd. v. Esposito*, 2017 IL 121297, ¶ 5. Dismissal is appropriate only where it is apparent that no set of facts can be proven that would permit the plaintiff to recover. *Cochran v. Securitas Security Services, USA, Inc.*, 2017 IL 121200, ¶ 11. We review a trial court's dismissal under section 2-615 *de novo*. *Id.*

¶ 14    Turning first to the breach of contract theory, the providers allege that they are intended third-party beneficiaries of the settlement agreement and that Liberty and Morse Automotive's failure to pay them the amount due amounted to a breach of that settlement agreement. The trial court agreed that the providers were third-party beneficiaries of the agreement and found that the complaint stated a cause of action against Morse Automotive but dismissed this count against Liberty based on its finding that the latter was not a party to the settlement agreement.

¶ 15    We agree that the providers failed to allege that Liberty was a party to the settlement agreement in the first instance. On its face, the agreement (attached as an exhibit to the complaint), names Martinez as the petitioner and Morse Automotive as the respondent. In their opening brief, the providers claim that the agreement was signed by an attorney for Liberty rather than for Morse Automotive, but this allegation is not found in the complaint. Likewise, the providers allege on appeal that the workers' compensation policy "expressly prohibits" Morse Automotive from making payments under the Act but again fail to make this allegation in the complaint, nor do they attach the policy to the complaint, which prohibits us from considering it. See *Lake Point Tower Condominium Ass'n v. Waller*, 2017 IL App (1st) 162072, ¶ 10 ("[C]ourts may not rely on matters outside the complaint in considering a section 2-615 motion.").

¶ 16    To be sure, the agreement names Liberty as "respondent's insurance or service company" and Liberty—not respondent—made partial payments to the providers. The providers argue that the payments are particularly significant, citing *Yellow Book Sales & Distribution Co. v. Feldman*, 2012 IL App (1st) 120069, ¶¶ 38-39, for the proposition that a disclosed agent's demonstration of its willingness to pay the principal's obligation renders it directly liable for those obligations. But *Yellow Book* does not so hold. There, the agent *executed* the contract on behalf of the disclosed principal but argued that he was not personally liable. *Id.* ¶ 34. This court noted that an intent to be personally liable need not be expressed, but can be inferred from the facts in evidence. *Id.* ¶¶ 38-39. Here, there is no allegation in the complaint that Liberty signed the settlement agreement on behalf of Morse Automotive, thus distinguishing this case from *Yellow Book*. Ultimately, there are insufficient allegations to establish that Liberty is a party to the agreement. And without these allegations, we agree with the trial court that the providers have not stated a cause of action against Liberty for breach of contract.

¶ 17    The providers next challenge the dismissal of count III, which alleges a violation of section 8.2(d)(3) of the Act, requiring an employer who fails to pay a provider within 30 days of receipt of a bill that contains substantially all of the necessary requirements to adjudicate it to pay interest of 1% per month to that provider. 820 ILCS 305/8.2(d)(3) (West 2012). The providers do not dispute that this section does not expressly provide for a private right of action but argue that a private right of action is implied. We rejected this identical argument in *Marque Medicos Fullerton, LLC v. Zurich American Insurance Co.*, 2017 IL App (1st) 160756, ¶¶ 56-61, and we decline to depart from this decision today.

¶ 18 In order to determine whether a statute implies a private right of action, we must consider whether (1) the plaintiff is a member of the class that the statute is intended to benefit, (2) the plaintiff's injury is one the statute was designed to prevent, (3) a private right of action is consistent with the underlying purpose of the statute, and (4) implying a private right of action is necessary to provide an adequate remedy for statutory violations. *Fisher v. Lexington Health Care, Inc.*, 188 Ill. 2d 455, 460 (1999). With regard to the first factor, the providers argue that because the payment obligation in section 8.2(d)(3) is to providers alone, they are members of the class the statute is intended to benefit. But the court in *Zurich* disagreed, relying in part on *Fisher* (*Zurich*, 2017 IL App (1st) 160756, ¶ 59 (citing *Fisher*, 188 Ill. 2d at 462-63)), which we find dispositive.

¶ 19 In *Fisher*, two nursing home employees who had cooperated with an investigation into the death of a nursing home resident sought to imply a private right of action for retaliatory conduct under section 3-608 of the Nursing Home Care Act (210 ILCS 45/3-608 (West 1996)). *Fisher*, 188 Ill. 2d at 456-58. Section 3-608 prohibits a nursing home facility or its agents from discharging or retaliating against a resident, resident's representative, or an employee who testifies or reports misconduct under certain sections of that statute. 210 ILCS 45/3-608 (West 1996). The supreme court rejected the plaintiffs' contention that this section implied a private right of action, explicitly holding that, as nursing home employees, they were not part of the class the statute was designed to protect. *Fisher*, 188 Ill. 2d at 463. In reaching this conclusion, the court did not consider section 3-608 standing alone, but read the statute as a whole. *Id.* at 462-63. And as a whole, the court found the Nursing Home Care Act was not designed to protect nursing home employees from retaliation for reporting misconduct. *Id.* at 463. Rather, the statute's "central purpose" was to protect nursing home *residents*, and section 3-608 merely served to advance that purpose. *Id.*

¶ 20 The same analysis governs here. The "fundamental purpose" of the Act is to "afford protection to *employees* by providing them with prompt and equitable compensation for their injuries." (Emphasis added.) *Kelsay v. Motorola, Inc.*, 74 Ill. 2d 172, 180-81 (1978). As *Zurich* noted, the interest required to be paid to providers under section 8.2(d)(3) merely encourages this prompt payment by penalizing delays in compensation. *Zurich*, 2017 IL App (1st) 160756, ¶ 60. In other words, the benefit to providers is incidental to the Act's central purpose. *Id.* Accordingly, we conclude that the providers are not members of the class the Act was intended to benefit and, as such, are not entitled to pursue a private right of action under section 8.2(d)(3). See *Abbasi v. Paraskevoulakos*, 187 Ill. 2d 386, 393 (1999) (declining to analyze all four factors where the plaintiff failed to satisfy one factor of the analysis).

¶ 21 The medical providers attempt to distinguish *Zurich* on the basis that this case involves a settlement agreement and a market conduct examination that disclosed Liberty's practice of not paying interest on medical bills. But we fail to understand how these extraneous materials bear on the question of whether section 8.2(d)(3) implies a private right of action. This is a matter of statutory interpretation for which we cannot consider matters outside the statute.

¶ 22 Finally, we address the sufficiency of the providers' claim under the Consumer Fraud Act. This claim is premised on the validity of Martinez's assignment of all his "right, title and interest" in the settlement contract to the medical providers. Liberty argues that the Act forbids this assignment, and we agree.

¶ 23 Section 21 of the Act provides:

"No payment, claim, award or decision under this Act shall be assignable or subject to any lien, attachment or garnishment, or be held liable in any way for any lien, debt, penalty or damages, except the beneficiary or beneficiaries of a deceased employee who was a member or annuitant under Article 14 of the 'Illinois Pension Code' may assign any benefits payable under this Act to the State Employees' Retirement System." 820 ILCS 305/21 (West 2012).

¶ 24 The medical providers do not dispute that the plain language of the Act prohibits assignment of awards or decisions but maintain that the purpose of this prohibition is to protect an injured worker from his creditors and not to prevent the injured worker from tasking a third party with enforcing his rights to payment of benefits. In other words, the providers urge us to find an implicit exception to the prohibition on assignment. But the rules of statutory construction prohibit us from accepting the providers' invitation.

¶ 25 Our supreme court has cautioned that we cannot construe a statute to add an exception when none otherwise exists. *In re Michael D.*, 2015 IL 119178, ¶ 9 ("It is never proper to depart from plain language by reading into a statute exceptions *** which conflict with the clearly expressed legislative intent."). And it is a well-established canon of statutory construction that where the statutory language expresses certain exceptions, it is construed as an exclusion of any other exceptions. *State v. Mikusch*, 138 Ill. 2d 242, 250 (1990). This is the case here. The Act excepts from its general prohibition against assignment those assignments made by beneficiaries of certain deceased employees. It does not include an exception for an injured worker to assign the enforcement of his rights to a third party.

¶ 26 But even assuming that the Act could be read to allow Martinez's assignment of his rights under the settlement contract, we nevertheless agree that the providers have not stated a claim under the Consumer Fraud Act, which requires a plaintiff to plead (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, and (3) the occurrence of the deception during a course of conduct involving trade or commerce. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417 (2002).

¶ 27 Significantly, a deceptive act or practice "involves more than the mere fact that a defendant promised something and then failed to do it," given that this type of "deception" occurs every time a defendant breaches a contract. (Internal quotation marks omitted.) *Avery v. State Farm Mutual Automobile Insurance Co.*, 216 Ill. 2d 100, 169 (2005). Indeed, "[w]ere *** courts to accept plaintiff's assertion that promises that go unfulfilled are actionable under the Consumer Fraud Act, consumer plaintiffs could convert any suit for breach of contract into a consumer fraud action." (Internal quotation marks omitted.) *Id.* Stated differently, a breach of contract is not tantamount to a violation of the Consumer Fraud Act, and we reject the providers' attempt to supplement their breach of contract claim with this "redundant remedy." (Internal quotation marks omitted.) *Id.*

¶ 28 The conclusion we reach today should not be construed to mean that we condone Liberty's conduct in failing to pay outstanding medical bills and interest as it is obligated to do under both the Act and its insurance policy. Accepting the well-pleaded allegations of the providers' complaint as true, Liberty's conduct in (i) accepting Morse Automotive's premiums under a policy of insurance that renders it "directly and primarily liable" for benefits payable under the Act, (ii) authorizing a settlement agreement that plainly contemplates payment of those benefits, and (iii) claiming after the fact that no benefits are payable threatens the stability and predictability of benefits the Act is designed to provide. See *McMahan v. Industrial Comm'n*,

183 Ill. 2d 499, 514 (1998) ("The refusal of an employer to pay for an injured employee's medical expenses is as contrary to the purposes of the [Act] as an employer's refusal to compensate the employee for lost earnings. *** Indeed, to the extent that nonpayment of medical expenses may imperil the employee's ability to obtain future treatment, the consequences of the employer's actions may actually be far worse."). Many employees, like Martinez, accept a lump sum settlement to cover not only past medical care but also medical care reasonably anticipated to be necessary in the future. But if a workers' compensation carrier can authorize a settlement whereby the employer undertakes to pay past due bills and then fail to remit policy proceeds to cover that obligation, the pool of medical providers willing to render services to patients suffering work-related injuries will necessarily diminish.

¶ 29    During oral argument, counsel for Liberty took the position that Morse Automotive's commitment in the settlement agreement "to pay all necessary and related medical expenses" was essentially illusory. This is because Liberty, to whom all of the medical bills had been submitted and who was obligated to "promptly" pay those bills, had not agreed that the medical expenses incurred by Martinez were "necessary and related." In other words, Liberty's position is that it may remain silent when medical bills are submitted directly to it, authorize its policyholder to enter into a settlement whereby the policyholder undertakes to pay those outstanding bills, and then leave both its policyholder and the injured worker on the hook for unpaid bills after the fact.

¶ 30    We do not read the Act as giving Liberty the option to refrain from raising any issues regarding the reasonableness of bills submitted to it until after its policyholder has, with its approval, committed to pay them. Rather, the Act contemplates that when an insurer receives bills allegedly relating to a work-related injury, the insurer will promptly raise any issues regarding whether the services rendered were reasonable and related to the employee's injury or whether the detail in the bills is insufficient to make that determination. 820 ILCS 305/8.2(d) (West 2012). As far as the record here discloses, Liberty never raised any such issues after receipt of bills from Marque Medicos.

¶ 31    Accepting the complaint's allegations as true, as we must, such conduct appears to be a textbook example of "vexatious and unreasonable" claims handling practices under section 155 of the Illinois Insurance Code (215 ILCS 5/155 (West 2012)). And the Director of Insurance should pay close attention to whether Liberty is, in fact, living up to its obligations under the stipulation and consent order. To that end, we are directing the clerk of the court to send a copy of the opinion to the Director of Insurance.

¶ 32    But as egregious as Liberty's conduct appears to be, it does not translate into recognition of a direct action by providers against Liberty. Rather, when the legislature enacted section 8.2 of the Act by amendment in 2011, it simultaneously created a remedy for its violation. In particular, section 8.2(e-20) provides that after a final award by the IWCC, a provider may resume efforts to collect unpaid bills from the employee and "the employee shall be responsible for payment of any outstanding bills *** as well as the interest awarded under subsection (d) of this Section." 820 ILCS 305/8.2(e-20) (West 2012). At first blush, the ability to pursue the injured employee for payment of outstanding medical bills appears to run counter to the overarching purpose of the Act to protect the interests of injured workers. But the legislature may well have assumed that an employee who receives an award from the IWCC is the party responsible for paying outstanding medical bills from the award. When, as here, that

is not the case, the methods of enforcing a workers' compensation carrier's obligation to pay outstanding medical bills are varied and somewhat circuitous.

¶ 33 Under the Act, the IWCC lacks authority to enforce its own awards and decisions. *Millennium Knickerbocker Hotel v. Illinois Workers' Compensation Comm'n*, 2017 IL App (1st) 161027WC, ¶ 21 (citing *Smith v. Gen Co.*, 11 Ill. App. 3d 106, 110 (1973)). Therefore, in order to enforce an employer's obligation to pay an award, the employee must look elsewhere.

¶ 34 One possible scenario is that when the providers pursue payment of outstanding bills from the employee, the employee, in an effort to enforce the IWCC award, can present a certified copy of the award to the circuit court under section 19(g) of the Act (820 ILCS 305/19(g) (West 2012)) in order to reduce the award to judgment. The employer, upon whom the obligation to pay is imposed under the award (and the judgment entered on the award), can, in turn, pursue a third-party action against its insurer for breach of the workers' compensation insurance policy and, presumably, for a violation of section 155 of the Insurance Code (215 ILCS 5/155 (West 2012)). If the circuit court finds that there has been a failure to pay the employee in accordance with the IWCC award, section 19(g) further mandates an award of attorney fees and costs incurred by the employee not only in the circuit court action, but also in the proceedings before the IWCC.

> "In a case where the employer refuses to pay compensation according to such final award or such final decision upon which such judgment is entered the court *shall* in entering judgment thereon, tax as costs *** the reasonable costs and attorney fees in the arbitration proceedings and in the court entering the judgment for the person in whose favor the judgment is entered ***." (Emphasis added.) 820 ILCS 305/19(g) (West 2012).

And the fees and costs recovered by the employee as well as the employers' own attorney fees and costs would be compensable damages proximately caused by the insurer's breach of contract. In the end, the recalcitrant insurer would end up paying its own, its insured's, and the employee's attorney fees and costs, plus whatever sums the court deemed appropriate under section 155. 215 ILCS 5/155(1) (West 2012) (providing for an award of up to $60,000 in addition to attorney fees and costs). Accordingly, the price of an insurer's decision to stonewall payment of benefits due under an IWCC award is, indeed, steep.

¶ 35 Alternatively, there are two provisions of the Act that provide for the award by the IWCC of additional compensation to the employee in the case of nonpayment of benefits. First, section 19(k) of the Act authorizes the employee to seek and the IWCC to award additional compensation equal to 50% of the amount otherwise payable to the employee if the employer vexatiously delays in paying benefits due under the Act. 820 ILCS 305/19(k) (West 2012). In the event the IWCC determines that a penalty is appropriate under section 19(k), section 16 of the Act further authorizes an award of attorney fees and costs "against such employer *and his or her insurance carrier*." (Emphasis added.) *Id.* § 16. Second, section 19(*l*) contemplates that an employee may file a written demand for payment of benefits for necessary medical care payable under section 8(a). *Id.* § 19(*l*) In the event of such written demand, the employer must respond within 30 days, articulating in writing the reason for the delay. Section 19(*l*) further provides:

> "In case the employer *or his or her insurance carrier* shall without good and just cause fail, neglect, refuse, or unreasonably delay the payment of benefits under Section 8(a) ***, the Arbitrator or the Commission shall allow to the employee additional

compensation in the sum of $30 per day for each day that the benefits under Section 8(a) *** have been so withheld or refused, not to exceed $10,000." (Emphasis added.) *Id.*

¶ 36 What is common to all of these alternative courses of action is that they must be undertaken by the employee for whose benefit these provisions were enacted. Which brings us to another, less circuitous means of avoiding this problem in the future. Attorneys handling workers' compensation cases on behalf of claimants must be cognizant of their clients' potential post-award exposure to claims by medical providers for unpaid bills. As noted, if, as happened here (and apparently in a number of other cases involving Liberty), the employer does not fulfill its undertaking to pay outstanding medical bills, providers are permitted to pursue payment from the injured employee. With that in mind, competent counsel should insist that any settlement agreement contain a sum certain that the employer has agreed to pay for outstanding medical bills and also contain a representation that the employer has consulted with its insurance carrier and secured the carrier's commitment to pay that amount upon execution of the settlement. The settlement here contained no such detail and merely provided that Morse Automotive "will pay all necessary and related medical expenses *** that have been submitted prior to contract approval and that contain all the required data elements." This lack of specificity permitted Liberty to "lay in the weeds" to the employee's, the providers' and, ultimately, its own policyholder's detriment.

¶ 37                                CONCLUSION

¶ 38 We affirm the trial court's dismissal of the providers' claims for breach of contract, violation of section 8.2(d)(3) of the Act against Liberty, and violation of the Consumer Fraud Act against both defendants. We further order the clerk of the court to send a copy of this opinion to the Director of Insurance.

¶ 39          Affirmed.