INTERNATIONAL CAPITAL CORPORATION, Plaintiff-Appellee, v. GREG MOYER, Defendant (Marcus and Millichap Real Estate Investment Brokerage Company of Chicago, Defendant-Appellant).

First District (3rd Division)    No. 1—02—2401

Opinion filed March 10, 2004.

Alan J. Mandel, of Alan J. Mandel & Associates, Ltd., of Skokie, for appellant.

Penny T. Brown and Wendy B. Kahn, both of Much, Shelist, Freed, Denenberg, Ament & Rubenstein, P.C., of Chicago, for appellee.

JUSTICE HALL delivered the opinion of the court:

The plaintiff, International Capital Corporation (ICC), filed a complaint against the defendants, Marcus and Millichap Real Estate Investment Brokerage Company of Chicago (M&M) and Greg A. Moyer, seeking damages resulting from the defendants' disbursement of escrowed funds.

Following a bench trial, the circuit court of Cook County entered

judgment in favor of ICC and awarded damages in the amount of $43,105.32 against M&M only.[1]

M&M raises the following issues on appeal: whether there was sufficient evidence that M&M breached its fiduciary duty to ICC and whether ICC was entitled to the full amount of the escrow as damages for M&M's alleged breach of fiduciary duty.

The pertinent testimony from the bench trial in this case is summarized below.

Robert W. Forloine testified as follows.

Mr. Forloine is the owner of ICC. ICC is in the business of buying and managing apartments.

On April 27, 1998, Mr. Forloine entered into a contract to purchase a 128-unit apartment complex in Madison, Wisconsin, from Park I. Butch and R. Adam Sarauskas (the sellers). Mr. Forloine deposited $25,000 as earnest money. Scott Harris, the M&M broker who showed him the property, suggested that M&M act as escrowee of the earnest money. The closing on the property was to take place in mid-July 1998.

In a letter dated August 17, 1998, to Mr. Harris, Mr. Forloine requested an extension of the closing date and authorized an additional $10,000 to be added to the escrowed earnest money fund. There were no discussions regarding M&M's representation of ICC, and Mr. Forloine was not aware of any agreement that M&M had with the sellers.

In a letter to M&M dated October 16, 1998, Mr. Forloine requested another extension. He agreed to place another $5,000 in the earnest money escrow. The letter did not authorize the disbursement of the additional $5,000 without further communication from M&M. It was also his understanding that the now $40,000 in escrow could not be disbursed without any further communication from M&M. The October 16, 1998, letter was not a consent to the distribution of the escrowed funds. It was Mr. Forloine's understanding that the escrowed funds would not be disbursed until both parties agreed to it or a court ruled that the funds could be released.

In a letter dated October 21, 1998, to Mr. Harris, Mr. Forloine enclosed the check for $5,000 for the extension of the contract, which was to be held for deposit until Mr. Forloine received the signed subscription agreement from his investors and a written confirmation by the sellers of the extension of the contract through December 15, 1998. His October 21, 1998, letter did not authorize M&M to disburse the escrowed funds without further communication from Mr. Forloine.

---

[1]No judgment was entered against Mr. Moyer, and he is not a party to this appeal.

Mr. Forloine was not aware that, in March 1999, the sellers made a demand on M&M for release of the escrowed funds. Mr. Forloine received a letter, dated April 12, 1999, from Greg Moyer, first vice-president of M&M, advising him of a letter from the sellers instructing Mr. Moyer to forward the escrowed funds. Mr. Moyer requested Mr. Forloine's authorization to release the funds. In a letter dated April 16, 1999, Mr. Forloine responded to Mr. Moyer's April 12, 1999, letter, stating that he "would like to request that the funds remain in escrow, while our firm completes its work to secure equity funds for the acquisition of The Woodlands."

In May 1999, Mr. Forloine received a call from a prospective purchaser for the property. Mr. Forloine contacted Mr. Harris and was told that M&M had been pressured by the sellers into releasing the escrowed funds. Mr. Forloine never received written notice of default or termination of the contract from the sellers. At a meeting in May 1999, Mr. Moyer told Mr. Forloine that he had been under pressure to release the funds.

On cross-examination, Mr. Forloine acknowledged Mr. Moyer's April 12, 1999, letter, stating that the previous correspondence had waived all contingencies, that the earnest money deposit was nonrefundable and that the closing date had long since passed. However, he did not consider the letter to be notification that the contract was terminated because Mr. Moyer did not have the authority to terminate the contract. As of April 12, 1999, Mr. Forloine was still working toward purchasing the property, with the knowledge of both M&M and the sellers. Even though the extension expired on December 15, 1998, Mr. Forloine expected to purchase the property when he tendered the purchase price, based upon conversations with Mr. Harris.

Mr. Forloine's December 10, 1998, letter to Mr. Harris requested an extension until December 22, 1998. However, the sellers never signed the extension request, and there was no closing on December 22, 1998. According to Mr. Forloine, M&M informed him that the sellers still wished to pursue the transaction with ICC even though there was no formal contract. Mr. Forloine further acknowledged that, in his May 27, 1998, letter to Mr. Harris, he agreed to waive the 30-day period ICC had to do a physical inspection of the property and a review of all of the books and records, in order to receive an extension of the contract. While Mr. Forloine admitted that ICC had accessed the escrow funds, he explained that it had been done by accident, and once the mistake was discovered, the funds were restored.

Greg Moyer testified as an adverse witness as follows.

According to Mr. Moyer, there was no written escrow agreement. He acknowledged writing the April 12, 1999, letter to Mr. Forloine

requesting that he authorize the distribution of the escrowed funds. He admitted that he never received a signed authorization from Mr. Forloine agreeing to the disbursement of the escrowed funds. He further admitted receiving Mr. Forloine's April 16, 1999, letter in which Mr. Forloine indicated that he objected to the disbursement of the escrowed funds.

In making the decision to disburse the escrowed funds, Mr. Moyer reviewed the purchase contract and the addenda, which removed various contingencies, including the inspection and financing contingencies, and increased the earnest money, which was to be considered nonrefundable, liquidated damages in the event of a buyer default. Prior to releasing the funds, Mr. Moyer requested and the sellers signed an indemnification agreement.

Although Mr. Moyer believed that he had a sufficient basis to distribute the escrowed funds, he requested Mr. Forloine's consent as a courtesy; he did not think that Mr. Forloine would sign it. He ignored Mr. Forloine's April 16, 1999, letter because the extensions of the contract had long since expired and because Mr. Forloine had stated that the funds were liquidated damages and nonrefundable. Mr. Moyer admitted that the word "nonrefundable" did not appear in Mr. Forloine's October 16, 1998, letter. However, that letter was one of a series of letters associated with the contract.

Mr. Moyer did not recall receiving a demand letter from the sellers in September 1998. He obtained the indemnification agreement from the sellers as a good business practice, although he did not obtain one in every case. Based on Mr. Forloine's April 16, 1999, letter, Mr. Moyer was aware that there was a dispute between Mr. Forloine and himself, but he did not consider that it had any merit. Mr. Moyer denied having an obligation as escrowee to further determine what objection Mr. Forloine had to the release of the escrowed funds. Mr. Moyer did acknowledge that M&M held the funds for the mutual benefit of the parties. However, he denied having any responsibility to Mr. Forloine in disbursing the funds.

According to Mr. Moyer, there was usually a notice of termination from a seller. In this case, there was a September 3, 1998, notice of termination. Mr. Moyer did not know if the sellers sent a notice of default to Mr. Forloine.

Adam Sarauskas testified as follows.

Mr. Sarauskas was one of the owners of the property that was the subject of the contract in this case. Edward Streit had sold the property to Messrs. Sarauskas and Butch on contract. Mr. Sarauskas had signed the hold-harmless agreement prepared by M&M. It was his understanding that ICC had waived all of the contingencies, including that

of title and financing. Mr. Sarauskas thought that he had provided written notice of the termination of the contract to Mr. Forloine but acknowledged that the negotiations were handled through the broker.

On cross-examination, Mr. Sarauskas testified that he had never been notified by anyone representing Mr. Forloine that Mr. Sarauskas was not authorized to sell the property. He was present and signed at the closing when the property was finally sold. Mr. Sarauskas was ready, willing and able to deliver title to the property on December 15, 1998.

At the conclusion of the trial, the court found that the facts were basically not in dispute: there was $40,000 in escrowed earnest money funds, the sale never closed and the $40,000 was distributed to the sellers without the consent of ICC.

The trial court noted that an escrowee owed a fiduciary duty to act only in accordance with the terms of the escrow and that the oral escrow instructions, to the extent they existed, did not direct M&M to pay the escrowed funds to the sellers upon the happening of a particular event. In the absence of specific instructions, M&M was required to hold the funds for the benefit of both parties.

The trial court also relied on section 1450.40 of the Illinois Administrative Code (the Code) (68 Ill. Adm. Code § 1450.40 (1996)), which provided that a broker who is holding escrowed funds and is aware of a dispute over those funds must continue to hold them until the dispute is resolved or until a civil action is filed, at which time the funds may be paid into the court.[2]

The trial court concluded that M&M had breached its fiduciary duty to ICC and entered judgment against M&M in favor of ICC in the amount of $40,000. Subsequently, the judgment amount was increased to $43,105.32, to reflect prejudgment interest.

This timely appeal followed.

## ANALYSIS

### I. STANDARD OF REVIEW

■ In a bench trial, a trial court's findings will not be disturbed on review unless they are against the manifest weight of the evidence. See *Fantino v. Lenders Title & Guaranty Co.*, 303 Ill. App. 3d 204, 206, 707 N.E.2d 756, 758 (1999). The reviewing court gives great deference to the trial court's findings because, as the trier of fact, the trial court is in a superior position to observe the witnesses while testifying, to judge their credibility and to determine the weight their testimony and other evidence should receive. *Wildman, Harrold, Allen*

---

[2]Now found at 68 Ill. Adm. Code § 1450.175(h) (2004).

& *Dixon v. Gaylord*, 317 Ill. App. 3d 590, 599, 740 N.E.2d 501, 510 (2000). A judgment is against the manifest weight of the evidence only if the opposite conclusion is apparent or when findings appear to be arbitrary, unreasonable, or not based on the evidence. *Fantino*, 303 Ill. App. 3d at 206, 749 N.E.2d at 758.

M&M maintains that this court should apply a *de novo* standard of review to this case because the trial court stated that the facts were basically undisputed.

■ What ordinarily may be a question of fact becomes a question of law if the factual circumstances are undisputed and no reasonable difference of opinion could arise about the inferences that can be made from those facts. *Brandt v. Boston Scientific Corp.*, 204 Ill. 2d 640, 648, 792 N.E.2d 296, 301 (2003). Differing inferences as to whether a breach of fiduciary duty occurred could be drawn from the testimony of Mr. Forloine and Mr. Moyer. Therefore, *de novo* review would not be proper in this case. See *Ceres Illinois, Inc. v. Illinois Scrap Processing, Inc.*, 114 Ill. 2d 133, 500 N.E.2d 1 (1986) (supreme court held that the appellate court correctly applied the manifest weight standard in reviewing the evidence, even though the appellate court's ultimate holding was that the trial court misapplied the applicable law).

## II. BREACH OF FIDUCIARY DUTY

■ In order to state a claim for breach of fiduciary duty, it must be alleged that a fiduciary duty exists, that the fiduciary duty was breached, and that such breach proximately caused the injury of which the plaintiff complains. *Neade v. Portes*, 193 Ill. 2d 433, 444, 739 N.E.2d 496, 502 (2000).

The parties do not dispute that a fiduciary relationship existed in this case.

M&M contends that no breach of fiduciary duty occurred in this case. M&M relies on the contract terms and the letter of October 16, 1998, to support its argument.

The contract provided in pertinent part:

"7. The earnest money shall be held by Marcus & Millichap for the mutual benefit of the parties."

The rider to the contract provided in pertinent part as follows:

"1. **CONTINGENCIES TO CONTRACT**.

\* \* \*

(f) Upon execution of this Contract, Purchaser will deposit as earnest money (the 'Earnest Money') cash in the amount of Twenty-Five Thousand Dollars ($25,000.00) in an interest-bearing escrow account held by Marcus and Millichap Real Estate Invest-

ment Brokerage Company (the 'Escrow Agent'). Any interest earned from the Earnest Money shall be credited to the party entitled to receive the Earnest Money. Operation of the escrow will be governed by this Contract.

\* \* \*

15. **DEFAULT**. In the event of a default by the Seller hereunder, Purchaser may at its option (a) elect to enforce the terms hereby by action for specific performance; (b) exercise any other right or remedy available to it at law or in equity; and/or (c) terminate this Contract (but such termination shall not waive any other right or remedy which Purchaser may have.) In all events, Purchaser's rights and remedies shall always be non-exclusive and cumulative; the exercise of one remedy shall not be exclusive of or constitute a waiver of any other. If this Contract is terminated by reason of a default by Purchaser and without fault of Seller, Seller's sole remedy shall be receipt of the $25,000 earnest money."[3]

In his October 16, 1998, letter to Mr. Harris, Mr. Forloine stated in pertinent part as follows:

"We would appreciate the Seller *reinstating and extending the contract to a final closing date on or before December 15, 1998.* \* \* \*

In consideration for this extension, I am prepared to provide a check in the amount of $5,000 to be added to the previously submitted $35,000 earnest money deposit, which will be considered liquidated damages if the property is not purchased by our investment group. At closing, the funds will be credited to the Purchaser and deducted from the purchase price. If this is acceptable with the Seller, please ask him to acknowledge his acceptance by signing below." (Emphasis added.)

The exhibit reflects that Mr. Sarauskas signed the letter as requested.

M&M argues that, together, the contract and Mr. Forloine's October 16, 1998, letter, gave M&M the authority to disburse the escrowed funds to the sellers because the contract did not close on December 15, 1998, and the $40,000 in escrowed funds were designated as liquidated damages in the event the contract did not close.

■ Escrowees have been found to owe a fiduciary duty both to the party making the deposit and the party for whose benefit it is made. *Fantino*, 303 Ill. App. 3d at 208, 707 N.E.2d at 759. Under this analysis, the escrowee owes a duty to act only in accordance with the escrow instructions. *Fantino*, 303 Ill. App. 3d at 208, 707 N.E.2d at 759.

---

[3]The parties deleted the provision of the standard contract form used in this case providing that, in the event the contract is terminated without the fault of the purchaser, the earnest money is to be returned to the purchaser and that in the event of a default by the purchaser, upon notice to the purchaser, the earnest money is forfeited to the seller.

In this case, the operation of the escrow was to be governed by the contract. However, the contract merely provided that the earnest money was to be held for the "mutual benefit of the parties" and would be applied to the purchase price at closing. There were no provisions, in either the contract or the addenda thereto, governing the disbursement of the earnest money in the event the contract did not close. The contract and the addenda merely provided a remedy in the form of liquidated damages.

■ Moreover, "liquidated damages" means "[a]n amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches." Black's Law Dictionary 395 (7th ed. 1999). The reference to liquidated damages in Mr. Forloine's October 16, 1998, letter merely determined the amount of damages, not what constituted a breach of contract or under what conditions M&M could disburse the escrowed funds.

In *Fantino*, the reviewing court reversed the trial court's finding of a breach of fiduciary duty, where the escrowee disbursed the escrowed funds, despite the lack of written authorization from the Fantinos because the terms of the escrow agreement allowed the disbursement without the Fantinos' written authorization. *Fantino*, 303 Ill. App. 3d at 208-09, 707 N.E.2d at 759.

Neither the contract terms nor the October 16, 1998, letter authorized or set forth the terms for disbursing the escrowed funds in the event the contract did not close. In the absence of written instructions regarding disbursement of the escrowed funds, M&M was required to hold the funds for the "mutual benefit of the parties."

The case of *McBride v. Commercial Bank of Champaign*, 101 Ill. App. 3d 760, 428 N.E.2d 739 (1981), is instructive. As Justice Mills, writing for the court, succinctly put it:

"A bank as escrow agent.

Can it relinquish documents in escrow solely upon the demand of one party to the agreement?

No—if it does, it is at its own peril." *McBride*, 101 Ill. App. 3d at 761-62, 428 N.E.2d at 739-40.

In *McBride*, the bank-escrowee was informed by the plaintiff-purchaser that the contract had been performed and by the sellers that the contract had been terminated; each party demanded the documents the bank was holding in escrow. The bank returned the documents to the sellers. Since the escrow agreement contained no provision for the delivery of the documents, the trial court ruled that the bank could deliver the documents to the party of its choice.

The reviewing court noted, first, that where an escrow provision is ambiguous because of a material omission, it is the duty of the trial

court to construe the escrow, and its construction will be upheld unless it is against the manifest weight of the evidence. *McBride*, 101 Ill. App. 3d at 765, 428 N.E.2d at 742. However, the court determined that the trial court's construction of the agreement rendered it useless to protect the purchaser's interests.

The court observed that the bank had assumed a duty to both parties and was bound to follow their instructions. The omission of an instruction did not lessen the bank's duty to follow the instructions that were given. As agent of both parties, the bank was bound to follow the instructions of both parties. The court explained the solution to the dilemma as follows:

> "The fact that it was faced with conflicting instructions and demands did not give the Bank the right to favor one party over the other, but rather placed the Bank upon notice that in obeying the instructions of one and disregarding those of the other, it acted at its peril. [Citations.] An escrowee which is willing to ignore the instructions of one of its principles in order to comply with the instructions of the other cannot escape being held accountable for its actions. Faced with this dilemma, the Bank's only prudent course of action would have been to file an action interpleading [the sellers] and [the purchasers] and deposit the documents with the court. [Citation.]" *McBride*, 101 Ill. App. 3d at 765-66, 428 N.E.2d at 742.

■ While *McBride* was a summary judgment case, its facts are similar to the ones in this case. The sellers demanded the escrowed funds, while ICC requested that M&M not disburse the escrowed funds. The escrow agreement, such as it was, contained no delivery instructions. Mr. Moyer testified that the decision to disburse the escrowed funds was justified by the contract and the addenda thereto. However, an escrowee is not the judge of whether the conditions of an escrow agreement have been performed. *Filosa v. Pecora*, 44 Ill. App. 3d 912, 916, 358 N.E.2d 1213, 1216 (1976). Moreover, there was evidence that Mr. Moyer was pressured by the sellers into disbursing the escrowed funds, that he attempted to obtain Mr. Forloine's written agreement to the disbursement and that he obtained a hold-harmless agreement from the sellers in connection with the disbursement of the escrowed funds.

M&M also argues that the trial court erred when it held that M&M owed extracontractual duties under the Real Estate License Act of 1983 (the Act) (225 ILCS 455/1 *et seq.* (West 1998)). M&M points out that there is no private right of action under the Act. See 225 ILCS 455/32 (West 1998) ("Nothing in this Act shall be construed to grant to any person a private right of action for damages or to enforce

the provisions of this Act or the rules and regulations issued under this Act").

■ In its judgment order in this case, the trial court relied on section 1450.40 of the Code, which provided in pertinent part as follows:

"(c) Disputes

1) In the event of a dispute over the return or forfeiture of any escrow monies held by the broker or if a broker knows that there are facts or circumstances which should reasonably cause a broker to know that any party to a transaction contests or disagrees with an anticipated disbursement of escrow monies held by the broker, the broker shall continue to hold the deposit in his special account:

A) until he has a written release from all parties consenting to its disposition;

B) until a civil action is filed, by either the broker or one of the parties, to determine its disposition, at which time payment may be made into the court." 68 Ill. Adm. Code § 1450.40 (1996).

See 68 Ill. Adm. Code § 1450.175(h) (2004).

■ The complaint in this case did not allege a cause of action based upon M&M's violation of section 1450.40 of the Code. The trial court's use of section 1450.40 did not violate section 32 of the Act. Rather, the provisions of section 1450.40 of the Code, while not conclusive, helped to establish the standard of care applicable to M&M in this case. See *Darling v. Charleston Community Memorial Hospital*, 33 Ill. 2d 326, 332, 211 N.E.2d 253, 257 (1965) (hospital regulations, standards and bylaws introduced into evidence performed the same function as evidence of custom and aided the jury in determining what was feasible and what the defendant knew or should have known).

We conclude that the trial court's finding that M&M breached its fiduciary duty to ICC was not against the manifest weight of the evidence.

### III. DAMAGES

M&M contends that ICC failed to prove that it suffered any damages as a result of any breach of fiduciary duty on the part of M&M. M&M maintains that the trial court awarded damages in this case because it believed erroneously that ICC did not have to prove any actual damages.

■ In a breach of fiduciary duty action, a wrongdoer is liable for the entire amount of the loss occasioned by his act. *Toro Petroleum Corp. v. Newell*, 33 Ill. App. 3d 223, 230, 338 N.E.2d 491, 496 (1974). However, plaintiffs must prove that a defendant's actions proximately caused their injuries before they can recover in tort, even in instances

of intentional torts where fiduciaries are involved. *Martin v. Heinold Commodities, Inc.*, 163 Ill. 2d 33, 59, 643 N.E.2d 734, 747 (1994).

M&M asserts that ICC was not damaged by the alleged breach of fiduciary duty because ICC never closed on the contract, the $40,000 represented liquidated damages, and ICC never established that the sellers defaulted under contract, all of which would have prevented ICC from obtaining the return of its earnest money deposit. M&M reasons that if ICC was not entitled to the return of its earnest money, then ICC could not be said to have incurred any damages.

In awarding damages, the trial court cited *McBride*. In *McBride*, the bank argued that, even if it had breached its fiduciary duty to the purchaser, there was no injury to the plaintiff based on the improper delivery of the deed. The bank pointed out that a quiet-title action was pending to determine whether the contract was terminated or performed. The *McBride* court concluded as follows:

> "The Bank is operating under the assumption that the Michigan case will determine that the contract has either been terminated or performed. Given the fact that the Bank terminated the escrow prior to the date [the sellers] had given [the purchaser] for curing his default, it is possible that the Michigan courts will decide that the contract has been neither performed nor properly terminated. With that result, perhaps [the purchaser] would be able to prove some damage that was a proximate result of the Bank's breach of duty. Furthermore, perhaps [the purchaser] would be able to prove that the quiet-title action in Michigan would never have been instituted if the Bank had not breached its duty to [the purchaser]. At this stage of the proceedings, we cannot say as a matter of law that [the purchaser] was not damaged by the Bank's breach of fiduciary duty to him. [Citation.]" *McBride*, 101 Ill. App. 3d at 766, 429 N.E.2d at 743.

In this case, there has been no judicial determination as to whether ICC was entitled to the return of the escrowed funds. Compare *Toro Petroleum Corp.*, 33 Ill. App. 3d 223, 338 N.E.2d 491 (plaintiff entitled to a judgment for the entire amount of escrowed funds based upon the escrowee's breach of fiduciary duty where the escrowee released the escrowed funds to the defendant who, the parties agreed and the trial court found, was not entitled to them because the defendant failed to secure the loan). In the absence of a finding that ICC was entitled to the return of its earnest money, M&M's breach of its fiduciary duty does not automatically entitle ICC to damages in the amount of the escrowed funds.

We conclude that, in the absence of a determination as to which party breached the contract in this case, the trial court erred in automatically awarding damages in the amount of the escrowed funds.

The award of damages must be based on the damages proximately caused by M&M's disbursement of the escrowed funds to the seller. Therefore, the damages award in this case must be vacated and the case remanded for a new hearing on damages.

The judgment of the circuit court is affirmed as to the finding that M&M breached its fiduciary duty to ICC. The award of damages and prejudgment interest is vacated, and the case is remanded to the circuit court for a new hearing on damages.

Affirmed in part and vacated in part; cause remanded with directions.

SOUTH and KARNEZIS, JJ., concur.