2022 IL App (1st) 200587

THIRD DIVISION
February 23, 2022

No. 1-20-0587

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| CHICAGO ARCHITECTURAL METALS, INC., and CAM-BUSH 8(A) JOINT VENTURE, LLC, | ) ) ) | Appeal from the Circuit Court of |
| Plaintiffs-Appellants, | ) ) | Cook County |
| v. | ) ) | 15 CH 15082 |
| BUSH CONSTRUCTION COMPANY, INC., | ) ) | Honorable Eve M. Reilly, |
| Defendant-Appellee. | ) | Judge Presiding |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice McBride concurred in the judgment and opinion.

**OPINION**

¶ 1    Chicago Architectural Metals, Inc. (CAM) and Bush Construction Company, Inc. (Bush) created Cam-Bush 8(a) Joint Venture, LLC to perform government construction work pursuant to a Multiple Award Task Order Contract at Scott Air Force Base. At the end of the four-and-a-half-year project, according to Bush's accounting, the two split approximately $50,000 in net profits. CAM, unhappy with the low profits, filed suit.

¶ 2    In its complaint, CAM alleged breach of fiduciary duty, accounting, breach of contract, and conversion. The case proceeded to bench trial where the circuit court entered directed findings in Bush's favor on the contract and conversion claims. It then issued a written trial

judgment also finding in Bush's favor on the breach of fiduciary duty and accounting claims. On appeal, CAM argues each of these decisions was incorrect. We disagree and, for the following reasons, affirm.

¶ 3                                    BACKGROUND

¶ 4      CAM was a small, minority-run business located in Cook County that specialized in steel fabrication. Bush is a medium-sized general contractor from Davenport, Iowa. Through the Small Business Administration, under the Code of Federal Regulations, larger companies may enter a mentor-protégé relationship with smaller, disadvantaged companies (an 8(a) company), to create a joint venture that retains the small business benefits of bidding on government contracts. As the trade-off, the mentor—larger company—is expected to train the protégé—smaller company—in business management, accounting, and the like.

¶ 5      In 2010, CAM and Bush created the Joint Venture to obtain a Multiple Award Task Order Contract, or "MATOC," for the Scott Air Force Base renovation project. We will refer to the Scott Air Force Base renovation project herein as the "SAFB project."

¶ 6      Think of a "MATOC" as being allowed into a small group of competitors who are then allowed to bid on each individual contract that might arise during the SAFB project. Bush initially estimated the government would issue approximately $40 million in construction contracts among the bidding firms. As it turned out, that number was much lower—closer to $10 million.

¶ 7      The Joint Venture Agreement provided that CAM owned 51% of the company, with Bush owning the remaining 49%. While CAM was designated as the initial manager, the Joint Venture was managed by both members. Specifically, "[t]he consent of all members is required to authorize any action on behalf of the [Joint Venture]." The Agreement provided that "Staff

required for Project Management and Project Supervision tasks will be provided by the Members. Members will submit monthly invoices to the [Joint Venture] for hours incurred in the performance of the contract." Critical to CAM's argument at trial, the Agreement also provided that:

"Notwithstanding any other provision herein to the contrary, the special consent of all of the Members shall be required in connection with the following matters:

(i) Any contract or agreement (including without limitation any contract or agreement for engineering, architectural, construction, environmental or financial or other consulting services, or a lease of equipment or facilities or extensions of credit on behalf of a supplier) calling for, or reasonably expected to call for, the payment over its terms by the [Joint Venture] of more than $100,000.00;

* * *

(viii) The employment or discharge of employees of the Company;

(ix) The adoption of pension and other employee benefit plans."

¶ 8 As to recordkeeping, the Agreement required the Joint Venture to "prepare and deliver to each Member financial statements and related reports reflecting the financial position of the [Joint Venture] at the close of the quarter." It also required that:

"A special bank account in the name of the joint venture will be established and administered. The account will require the signature of all Members for withdrawal purposes. All payments due to the joint venture for performance on an 8(a) contract will be deposited in the special account and all expenses incurred under the contract will be paid from the account."

¶ 9      Tragically, in August 2010, shortly after signing the Joint Venture Agreement, but before the Joint Venture was awarded any projects, CAM's owner, Alfred Von Samek, died in a construction site accident. This left Alfred's son, Jonathon, to run CAM. However, Jonathan testified at trial that CAM "couldn't go on without [his father]," and he decided to close the business in 2011.

¶ 10     Despite this, the Joint Venture, through Bush's control, continued to work on the SAFB project until 2015. The parties disagree about *why* Bush had nearly absolute control over the Joint Venture. Jonathan testified that Bush "hijacked" it, while Bush argued that CAM "abandoned" the MATOC. Either way, it is clear from the evidence that Bush controlled every aspect of the SAFB project. Bush fronted all costs, provided all employees, obtained the contracts, and hired the subcontractors. Jonathan admitted that early in the project, his brother, David, replaced him as the CAM representative for the Joint Venture. However, David did not testify at trial, and Jonathan was not aware of any work that David did for the Joint Venture. In fact, after handing over the reins to David, Jonathan did nothing and was not aware that David did anything:

> "[Bush's counsel]: Q. What did you do to monitor what David was doing in connection with the [SAFB] projects?
>
> [Jonathan]: A. I did nothing.
>
> Q. Did you ever ask David, David have you done anything to advance our interests in furtherance of the project?
>
> A. No, I did not.
>
> Q. Have you ever asked David if he did anything whatsoever for the [SAFB] project?
>
> A. No, I have not.

Q. And as you sit here today, you're not aware of any evidence, in fact, that he did do anything in furtherance of the project, are you?

A. No, I am not."

¶ 11 Robert Davis (Bush's current vice president of operations and the former project manager on the SAFB project) and A.J. Loss (Bush's founder and current president) confirmed that CAM's only contributions were a few phone calls in which the members discussed some managerial decisions, such as hiring a new project manager.

¶ 12 Although the Joint Venture Agreement required a separate bank account, it was uncontested that Bush never opened one. Instead, it opened an account, in its name only, that it used to receive and distribute all monies related to the MATOC and SAFB project. It was also uncontested that CAM did not have access to this account. A.J. Loss testified that he "would have" given CAM access if Jonathan had asked, but Jonathan never did.

¶ 13 As it was managing the SAFB project, Bush separated its accounting into two classes of books: project-specific accounts and a "general overhead" account—the 10040 account. Dianne Huber, Bush's project accountant for the SAFB project, testified that costs that could be attributed to a specific project were accounted for in that project-specific account, but there was "general overhead" that permeated multiple projects that were included in the 10040 account. Examples included administrative salaries, administrative costs not attributable to a specific project, travel expenses, cell phones, and the like.

¶ 14 A.J. Loss testified that Jonathan was told about this account from the beginning. But Jonathan testified that they never discussed specific billings to that account, nor did he ever authorize expenses such as travel or cell phone bills to be billed to that account.

¶ 15    Bush submitted regular financial reports to CAM, but they were not "invoices" and did not contain a significant amount of detail. They were mostly account summaries for the costs and expenses for the SAFB project. In these reports, the 10040 account was marked as a running total without detail. Over the course of the four-and-a-half-year lifespan of the SAFB project, Bush billed approximately $545,000 to the 10040 account.

¶ 16    At the end of the SAFB project, Bush's final accounting showed that it received $3,121,590.87 from the federal government. From this, it had deducted $2,531,896.94 in total costs accounted for in the project-specific accountings. These total costs included $324,418.62 of "Division 1" costs, which were Bush's overhead attributable to specific projects. After these "total costs" were deducted, there remained $589,693.93 in revenue. However, this amount was before Bush applied the "-544,316.95" balance of its 10040 account. After recouping some cost by trading in their construction trailers, Bush's initial final accounting showed a total net profit of $50,840.98. During the course of this litigation, a subsequent accounting would show a slightly higher net profit of $53,615.37.

¶ 17    Unhappy with the low profits, Jonathan looked deeper into the SAFB project's finances. Jonathan testified that he found numerous discrepancies that suggested—to him—that Bush had been siphoning off money throughout the SAFB project. For instance, he asserted that Bush's accounting provided little to no detail about how it paid itself and employees. He also noted several instances of "fluctuating" employee hourly rates. At trial, Huber—again, Bush's accountant—testified that the fluctuations were because employees were salaried. For example, if an employee made $1000.00 per week, their hourly rate would depend on whether they worked 20 or 60 hours. CAM's expert, Paul DiGangi, on the other hand, claimed that Huber's explanation would not explain such dramatic fluctuations.

¶ 18    As such, shortly after receiving the final accounting, CAM filed suit to recover what it believed was stolen profit. The amended complaint alleged breach of fiduciary duty, breach of contract, and conversion and sought an accounting as well. These claims were primarily premised on Bush's failure to establish a joint bank account and obtain unanimous consent for payments of greater than $100,000. All in all, the underlying theme of the complaint was that Bush had created the 10040 account to steal profits. A few months after CAM filed suit, Bush issued a check for CAM's 51% of the initially disclosed profit. (The remaining profit was paid by separate check on the first day of trial.) Ultimately, CAM received $27,307 in profits from the SAFB project.

¶ 19    The case proceeded to bench trial at the end of July 2019. As noted above, several witnesses testified about their involvement in, and accounting of, the SAFB project. Besides CAM's expert, DiGangi, each witness was involved in the project to some extent. After the close of CAM's case, Bush moved for a directed finding pursuant to section 2-1110 of the Code of Civil Procedure. On August 1, the court granted directed finding as to the contract and conversion claims.

¶ 20    As to the count sounding in breach of contract, the court ruled:

"I do not believe that [CAM] has met their burden of showing a *prima facie* case of breach of contract, mainly performance by the plaintiff. In several portions of the joint venture agreement, there were things that CAM was required to do which they did not do and it doesn't seem to be contested that they did not do. In Section 10.12, it says CAM will perform 51 percent of the field trade labor. I don't think there's any dispute that that was not done. Of course, there's also things that were not done by Bush. There's no question about that. But that's not where we're at right now. For purposes of the motion

7

for a directed finding, I'm looking at whether the plaintiff met their burden of establishing a *prima facie* case of breach of contract, and I do not believe they did so. 4.2 says that each member was to receive their proportionate share of the profit, but it also says they're supposed to share in their proportionate share of the costs, and I don't think there's any dispute CAM did not do that. 5.1, management, CAM was to manage the business affairs as well. They didn't do that."

¶ 21    Turning to the conversion count, the court stated:

"I know there were arguments back and forth with regards to the demand element; however, I don't think that is the issue with the conversion. I think the issue is that there has been no sum certain alleged, which is what is required when you have money; although, in the complaint it says an amount over $3 million. The testimony here was that the joint venture should have received somewhere in excess of $3 million; however, I think there is no dispute that there were costs involved in the jobs that would have to be paid, so the plaintiff would not have an immediate right to possession or control of that property. I do not believe that, at least the way it's been presented to this Court in this trial, there could be—or plaintiff has met the requirements for conversion."

¶ 22    For the fiduciary duty and accounting claims, the court denied the section 2-1110 motion and ordered written post-trial briefs. On October 31, 2019, before trial judgment, CAM moved for reconsideration of the directed findings. The court ordered Bush to respond and, on January 8, 2020, entered and continued the motion to reconsider.

¶ 23    On January 24, the court entered a written memorandum judgment order. The court found that Bush owed CAM a fiduciary duty and breached it. However, it concluded that CAM failed to prove damages and proximate cause. The court specifically found:

"Although the money from the SAFB was diverted to an account in Bush's name rather than in a joint venture account, the testimony at trial revealed the money received from the project was used in furtherance of the four year project. Diane Huber, Rob Davis and A.J. Loss all testified that the money was used in furtherance of the SAFB project. [Citations.] Once the project was complete, the remaining profit was distributed. [Citation.] CAM has not shown that there was additional profit it was due."

¶ 24 Further, it found that all of Bush's charges to the 10040 account were necessary to complete the projects after "CAM failed to do anything." While CAM argued that they were not all necessary, "the credible testimony of three Bush employees who worked on the project refuted this claim." While the court acknowledged that "Bush kept poor records," it noted that it was "an issue [Jonathan] could have addressed had he participated in the joint venture." With its findings, the court concluded that CAM had not proved its breach of fiduciary duty claim by a preponderance of the evidence.

¶ 25 As for the claim for an equitable accounting, the count found it unnecessary:

"The testimony at trial revealed that CAM was provided with the accounting it was entitled to. Bush did a final accounting and provided CAM with the documents. [Citation.] Further, Bush tendered all the financial documents in discovery and CAM had his own accountant evaluate the financial documents. Therefore, an equitable accounting is unnecessary as it would provide no more information than has already been provided."

¶ 26 Just over a month later, on March 3, 2020, the court denied the motion to reconsider the directed findings. In doing so, it acknowledged that, while "reconsideration as to § 4.2 of the contract may be appropriate, the remaining sections § 10.12 and § 5.1 do not warrant reconsideration."

¶ 27    CAM filed its notice of appeal on April 1, 2020.

¶ 28                                    ANALYSIS

¶ 29    Before this court, CAM argues that the court's trial judgment was against the manifest weight of the evidence, and that the court erred in entering a directed finding that CAM had not presented a *prima facie* case on the contract and conversion claims. But Bush claims that we lack jurisdiction to hear this appeal, so we will take that up first.

¶ 30                                        I

¶ 31    Before we tackle the jurisdictional issue, a review of the timeline of events in the trial court is in order:

August 1: court enters directed findings on contract, conversion counts;

October 31: CAM files motion to reconsider directed findings;

January 24: court enters trial judgment in favor of Bush on remaining three counts;

March 3: court denies reconsideration of directed findings on conversion, contract counts;

April 1: CAM files notice of appeal.

¶ 32    Bush attacks appellate jurisdiction in two different ways. First, it claims that the October 31 motion to reconsider was not timely, as it was filed more than 30 days after the August 1 judgment of a directed finding. That, says Bush, violates the 30-day deadline for motions to reconsider contained in section 2-1203 of the Code of Civil Procedure. See 735 ILCS 5/2-1203(a) (West 2018) ("In all cases tried without a jury, any party may, within 30 days after the entry of the judgment or within any further time the court may allow within the 30 days or any extensions thereof, file a motion for a rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief.").

¶ 33    And second, Bush argues that the court's judgment order of January 24, disposing of the remaining pending claims, had to be appealed within 30 days under Illinois Supreme Court Rule 303(a) (eff. July 1, 2017), unless a timely post-judgment motion was filed challenging *that* judgment order. Thus, because CAM did not file a notice of appeal until April 1, far more than 30 days after January 24, this appeal is untimely.

¶ 34    We disagree on both counts and find jurisdiction proper here.

¶ 35    A party must file its notice of appeal within 30 days of a final judgment or a timely post-judgment motion. Ill. S. Ct. R. 303(a) (eff. July 1, 2017). But a judgment that disposes of fewer than all the claims against all parties, even if "final," is not yet appealable—it is not appealable until *all* claims against *all* parties have been resolved by final judgment. See Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016); *In re Marriage of Gutman*, 232 Ill. 2d 145, 151 (2008). (There are exceptions to this rule that are not applicable here.)

¶ 36    The January 24 judgment finally disposed of some, but not all the claims—the two counts that were the subject of a directed finding were not yet resolved. It was not until those remaining counts were resolved, by the court's March 3 judgment order denying the motion to reconsider its directed finding, that all claims against all parties had been adjudicated—and thus CAM's right to appeal under Rule 303 ripened. See *Gibson v. Belvidere National Bank & Trust Co.*, 326 Ill. App. 3d 45, 48 (2001) (it is only after trial court has disposed of rights of all parties on all claims that final judgment is entered under Rule 303). As the April 1 notice of appeal was filed within 30 days of March 3, it was timely. See Ill. S. Ct. R. 303(a) (eff. July 1, 2017).

¶ 37    Bush claims that CAM was required to move for reconsideration of the directed-finding judgment within 30 days of that judgment, per section 2-1203 of the Code of Civil Procedure.

See 735 ILCS 5/2-1203 (West 2018). The failure to do, says Bush, renders those judgments non-appealable. That is incorrect.

¶ 38     Bush's confusion may lie in the fact that CAM challenged the directed-finding judgment in a "motion to reconsider," which is often the styling of a motion under section 2-1203, as well. But not every "motion to reconsider" filed in a case is a section 2-1203 motion. In fact, most are not. Before the trial court has disposed of all claims as to all parties at the end of the case, the court may enter any number of final-but-not-appealable judgments, and a party is free to file a "motion to reconsider" any of them. But they are not section 2-1203 motions.

¶ 39     To use a common example, a court may enter summary judgment on one count of a multi-count complaint, which would be a final but not *appealable* judgment. That judgment is interlocutory and may be reconsidered at any time by the trial court, either *sua sponte* or on motion of a party. See Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016) (unless trial court enters specific finding allowing immediate appeal, "any judgment that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties is not enforceable or appealable and is subject to revision at any time before the entry of a judgment adjudicating all the claims, rights, and liabilities of all the parties"); *Hernandez v. Pritikin*, 2012 IL 113054, ¶ 42 (recognizing "circuit court's inherent power to review, modify, or vacate interlocutory orders while the court retains jurisdiction over the entire controversy"); *Rowe v. State Bank of Lombard*, 125 Ill. 2d 203, 213 (1988) ("this court has repeatedly held that the circuit court has the inherent power to modify or vacate an interlocutory order granting summary judgment any time before final judgment").

¶ 40     Those kinds of "motions to reconsider" are routinely filed in a case before all claims are resolved against all parties, most typically when a court dismisses or enters summary judgment

on some but not all counts, sometimes very early on in a lawsuit. Because they involve interlocutory orders that a court may reconsider at any time before the final judgment that disposes of all claims as to all parties, there is obviously no time deadline for a party to move for reconsideration, either.

¶ 41    A motion to reconsider brought under section 2-1203, in contrast, is a motion of a very unique nature, with specific time deadlines with jurisdictional consequences. Section 2-1203 falls under part 12 of article II of the Code of Civil Procedure, entitled "Post-Trial," and it applies to "cases tried without a jury." 735 ILCS 5/2-1203(a) (West 2018). It clearly applies only to post-trial judgments after the court has entered a judgment that disposes of all claims as to all parties, which is why it contains the 30-day deadline for filing. That deadline corresponds to the time for filing a notice of appeal, giving a dissatisfied party a 30-day window to either (1) ask the court for reconsideration of the final and appealable judgment or (2) file a notice of appeal from that final and appealable judgment. The filing of a section 2-1203 motion will toll the time to appeal. See Ill. S. Ct. R. 303(a)(1) (eff. July 1, 2017).

¶ 42    And because a section 2-1203 motion stops the clock on an appeal deadline, only one may be filed, else a party could extend the proceedings in the trial court indefinitely. See *Dus v. Provena St. Mary's Hospital*, 2012 IL App (3d) 091064, ¶ 17 (" 'Successive post-judgment motions interfere with' " policy of " 'finality, a time when the case in the trial court is really over and the loser must appeal or give up' " (quoting *Sears v. Sears*, 85 Ill. 2d 253, 259 (1981))). Indeed, our supreme court codified the longstanding bar on successive post-judgment motions in 2005. See Ill. S. Ct. R. 274 (eff. July 1, 2019) ("A party may make only one postjudgment motion directed at a judgment order that is otherwise final and appealable. The motion must be

filed either within 30 days of that judgment order or within the time allowed by any extensions.").

¶ 43    Here, when CAM filed a "motion to reconsider" the August 1 judgment directing a finding on two counts, it was not filing a motion under section 2-1203. It was not attacking a final and appealable judgment. It was attacking an interlocutory order, no different than had it moved for reconsideration of a dismissal of a count of the complaint several years earlier. The August 1 judgment directing the finding on the contract and conversion counts was not entered after trial; it was entered mid-trial, after the close of the plaintiff's case—and more to the point, while three other counts remained pending. So that August 1 judgment, though final, was not yet appealable and was subject to reconsideration by the trial court (*sua sponte* or on motion) at any time before all claims against all parties were adjudicated. CAM's motion to reconsider was filed on October 31, before the court had entered its January 24 final judgment on the remaining counts. So section 2-1203's 30-day deadline, and the jurisdictional consequences it carries, did not apply.

¶ 44    We likewise cannot agree with Bush's other attack on jurisdiction. Bush points to the January 24 post-trial judgment, which disposed of all claims against all parties *other than* the contract and conversion counts that were directed out. Bush says that CAM had 30 days to either appeal that January 24 judgment or file a post-judgment motion attacking that judgment, pursuant to Illinois Supreme Court Rule 303(a) (eff. July 1, 2017), but instead he waited until April 1 to file a notice of appeal.

¶ 45    The problem with that argument, however, is that by January 24—specifically, on October 31 of the previous year—CAM had moved for *reconsideration* of the directed-finding judgment on the contract and conversion counts, and the court had not yet ruled on that motion.

So those two counts had not been finally resolved as of January 24. The January 24 judgment could not be appealed until all claims against all parties had been finally adjudicated, which did not happen until March 3, when the trial court denied the motion to reconsider. It was then and only then that all claims against all parties was resolved.

¶ 46    On March 3, CAM had 30 days to either file a notice of appeal, file a section 2-1203 motion directed at the judgment orders, or accept defeat. It chose the first of those options in a timely manner with its April 1 notice of appeal. Jurisdiction is proper here.

¶ 47                                    II

¶ 48    We next consider CAM's claim that the trial court erred in ruling in favor of Bush on the counts for breach of fiduciary duty and equitable accounting.

¶ 49    After a bench trial, we will reverse a judgment only if it is against the manifest weight of the evidence. *Gambino v. Boulevard Mortgage Corp.*, 398 Ill. App. 3d 21, 51 (2009). The manifest-weight standard gives great deference to the trial court, which is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in the testimony. *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59. A decision is against the manifest weight of the evidence " 'when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence.' " *Id.* (quoting *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002)). "In other words, if the record contains evidence to support the trial court's judgment," we should affirm. *Vician v. Vician*, 2016 IL App (2d) 160022, ¶ 27.

¶ 50                                    A

¶ 51    CAM first argues that the court erred in finding that it did not prove damages for Bush's breach of fiduciary duty. On appeal, as at trial, CAM claims that it proved damages by proving

that "Bush deducted and transferred to itself $868,735.57 out of [Joint Venture] funds, comprising of $544,316.95 (unauthorized deductions to the [Joint Venture]'s profit under account 10040) and $324,418.62 (unauthorized Division 1 cost deductions)."

¶ 52    A wrongdoer is liable for the entire loss caused by his breach of fiduciary duty. *International Capital Corp. v. Moyer*, 347 Ill. App. 3d 116, 126 (2004). But the plaintiff must still "prove that a defendant's actions proximately caused their injuries before they can recover in tort, even in instances of intentional torts where fiduciaries are involved." *Id.* at 126-27.

¶ 53    The court found that Bush breached its duties by taking control of the funds in its own accounts and by failing to provide adequate detail of how they were being used. But a breach does not automatically entitle a party to damages.

¶ 54    Take *Moyer*, for example, where the plaintiff, a would-be purchaser of property, placed $40,000 in an escrow account with the defendant broker during the pendency of a deal with the seller. *Id.* at 118-19. The deal ultimately never closed, and the defendant released the escrow funds to the seller without the plaintiff buyer's consent. *Id.* at 120-21. The trial court there found that defendant breached its fiduciary duty to plaintiff by unilaterally releasing the escrow funds, and we upheld that finding on appeal. *Id.* at 125-26.

¶ 55    But we vacated the damages award of $40,000 (plus interest) at the same time, as plaintiff never proved that it was entitled to a return of the escrow moneys—maybe it was, maybe it wasn't, depending on the outcome of the underlying dispute between plaintiff buyer and the seller, but no evidence had been presented that plaintiff, in fact, had a right to the return of the escrow money, as opposed to being required to forfeit it. *Id.* at 127-28. So even though the plaintiff proved that defendant breached its fiduciary duty to plaintiff, plaintiff had not established that any breach proximately caused plaintiff to lose the $40,000. *Id.*

¶ 56    Likewise, here, to succeed on its claim, CAM had to prove that the money Bush paid itself was money to which CAM was entitled. And it did not. The trial court found that Bush's conduct constituted a *breach*, to be sure, but it also found that the expenses Bush paid itself were necessary: "CAM would not have received any profit whatsoever if Bush had not incurred costs in furtherance of the project and paid its employees to do the work when CAM failed to uphold its end of the Agreement." We cannot disagree with that reasoning.

¶ 57    The court likewise rejected CAM's claim that Bush overpaid itself, charging additional expenses to the Joint Venture account that were not in furtherance of the project, finding that "the credible testimony of three Bush employees who worked on the project refuted this claim. As CAM did not participate in the joint venture and was never there, CAM has not sufficiently proved these claims."

¶ 58    The record supports that finding. Each Bush employee testified about the project costs and how the project revenue was used. They explained how they accounted for the projects and, importantly, why there was (relatively speaking) so little profit.

¶ 59    At most, CAM's evidence may have raised some question about the quality of their recordkeeping. But it presented no evidence that came close to proving that Bush stole profits through questionable accounting practices. The trial court's judgment was not against the manifest weight of the evidence, as the testimony and exhibits at trial fully support its decision.

¶ 60                                              B

¶ 61    Related to the breach of fiduciary duty, CAM argues that the court erred by finding no need for an equitable accounting. To obtain an equitable accounting, the plaintiff must show "the absence of an adequate remedy at law and one of the following: (1) a breach of a fiduciary relationship between the parties; (2) a need for discovery; (3) fraud; or (4) the existence of

mutual accounts which are of a complex nature." *People ex rel. Hartigan v. Candy Club*, 149 Ill. App. 3d 498, 501 (1986). We typically do not enforce the requirement that there be no adequate legal remedy when the accounting is based on a breach of fiduciary duty. *Id.*

¶ 62 In denying this claim, the court reasoned that Bush had already provided an accounting to CAM during discovery. We will not order an accounting when it would be "unnecessary." *Devyn Corp. v. City of Bloomington*, 2015 IL App (4th) 140819, ¶ 71. That is true even where there is a breach of fiduciary duty. *Tufo v. Tufo*, 2021 IL App (1st) 192521, ¶ 101; see also *Netisingha v. End of the Line, Inc.*, 107 Ill. App. 3d 275, 278 (1982) (accounting is not absolute right).

¶ 63 In *Tufo*, 2021 IL App (1st) 192521, ¶ 98, we upheld the trial court's ruling that an accounting was unnecessary because the information was disclosed in discovery and "failed to definitely show lost profits or other damages." See also *Devyn*, 2015 IL App (4th) 140819, ¶ 79 ("Defendant had already tendered all financial information relevant to the District when it turned its discovery material over to plaintiff. *** An equitable accounting of the District's fund would provide no more information than that which was already contained in the ledgers.").

¶ 64 Likewise, here, the court specifically found that an accounting had been disclosed and "CAM has not shown that there was additional profit it was due." We have been given no reason to question that conclusion, and we find no basis for disagreement. The court's judgment was not against the manifest weight of the evidence.

¶ 65 As these challenges are the only ones directed at the January 24 trial judgment, we affirm that judgment in its entirety.

¶ 66                                                    III

¶ 67 Finally, CAM challenges the court's judgment entering a directed finding on the contract and conversion counts. Section 2-1110 of the Code of Civil Procedure provides that,

"[i]n all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor. In ruling on the motion the court shall weigh the evidence, considering the credibility of the witnesses and the weight and quality of the evidence." 735 ILCS 5/2-1110 (West 2018).

¶ 68    Section 2-1110 motions are analyzed in a two-step process. *People ex rel. Sherman v. Cryns*, 203 Ill. 2d 264, 275 (2003). First, the court determines, as a matter of law, whether the plaintiff has proven a *prima facie* case. *Id.* If so, then the court, in its role as finder of fact, considers the totality of the evidence, weighing credibility and drawing inferences, to determine whether that *prima facie* case survives. *Id.* at 275-76; see *Edward Atkins, M.D., S.C. v. Robbins, Salomon & Patt, Ltd.*, 2018 IL App (1st) 161961, ¶ 54.

¶ 69    Here, the court expressly stated that its findings were based on the first step—CAM's failure to make out a *prima facie* case for breach of contract or conversion. To establish a *prima facie* claim, the question is whether there is " 'some evidence on every element essential to [the plaintiff's underlying] cause of action.' " *People ex rel. Sherman*, 203 Ill. 2d at 275 (quoting *Kokinis v. Kotrich*, 81 Ill. 2d 151, 154 (1980)). If the plaintiff fails to present a *prima facie* case, the court should enter judgment in the defendant's favor. *Atkins*, 2018 IL App (1st) 161961, ¶ 53. Our review at this first stage is *de novo*. *Id.* ¶ 54.

¶ 70                                          A

¶ 71    We first address the claim for breach of contract. The circuit court entered a directed finding on CAM's contract claim because it determined that CAM failed to perform under the Joint Venture Agreement.

¶ 72    To succeed on a contract claim, among other things, the plaintiff is obligated to prove he performed his end of the contract and did not materially breach it. *Larsen v. Carle Foundation*,

386 Ill. App. 3d 799, 803 (2008); see *McBride v. Pennant Supply Corp.*, 253 Ill. App. 3d 363, 367 (1993) (party who materially breaches contract cannot take advantage of terms that benefit him). To determine whether a breach is material, we consider: " '(1) [W]hether the breach defeated a bargained-for objective; (2) [W]hether the breach caused disproportionate prejudice to the non-breaching party; (3) [W]hether custom or usage shows the breach to be material; and (4) [W]hether allowance of reciprocal nonperformance would result in an unreasonable and unfair advantage to either party.' " *McBride*, 253 Ill. App. 3d at 368 (quoting *Heritage Bank & Trust Co. v. Abdnor*, 906 F.2d 292, 301 (7th Cir. 1990)).

¶ 73    CAM claims that it did perform its obligations or, at a minimum, that any breach was not material. The court initially found that CAM had breached sections 4.2, 5.1, and 10.12 of the Joint Venture Agreement. However, in denying the motion to reconsider, the court backtracked on the violation of section 4.2, so we will excise that aspect of the court's original finding.

¶ 74    Section 5.1 of the Joint Venture Agreement provided, in pertinent part: "The management and control of the conduct and operation of the [Joint Venture] and its business and properties shall be vested in the Members. CAM will be the initial manager of the [Joint Venture]. CAM will designate a CAM employee as project manager responsible for the performance of any 8(a) contract awarded." Section 5.1 obligated each member to "manage the affairs and business of the [Joint Venture]," to "be responsible for negotiation of contracts," and to "otherwise act in all other matters on behalf of the [Joint Venture]."

¶ 75    Section 10.12 provided in relevant part that "[t]he joint venture will perform the applicable percentage of work required by Sec. 124.520. CAM will perform a minimum of 51% of the field trade labor performed by the [Joint Venture]. Bush will perform no more than 49% of the field trade labor ***."

¶ 76    The circuit court found that CAM essentially abandoned the SAFB project. That point is beyond dispute. There was simply no evidence at trial that CAM did anything of substance on the SAFB project. Bush negotiated *all* projects, performed *all* work, and fronted *all* costs. The only evidence that CAM did anything is limited to minor managerial work of confirming a project manager—whom Bush found. The testimony was clear that CAM's appointed representative—particularly David—did almost no work.

¶ 77    Nor do we find any merit whatsoever in CAM's contention that their abandonment of the project was not "material." We see no reason to perform a detailed analysis of each *McBride* factor, as CAM urges in its brief. It is plainly obvious that CAM abandoned the project. We recognize, obviously, the tragic circumstances at the outset of the Joint Venture—the untimely death of Alfred, CAM's owner—which certainly explains why CAM did so. But that cannot excuse the abandonment, nor could we possibly find that a wholesale abandonment of a project on which CAM was supposed to perform 51% of the labor could constitute anything *but* a material breach of the contract. If that is not a material breach, it is hard to imagine what would be.

¶ 78    CAM thus failed to present a *prima facie* claim for breach of contract, as it presented no evidence that it performed its obligations under the Joint Venture Agreement. The court did not err by entering a directed finding.

¶ 79                                                    B

¶ 80    Lastly, CAM challenges the court's determination that it had not presented evidence that there was "an immediate right to possession or control" of the money Bush converted. Unlike the other claims, the conversion claim is *not* premised on Bush "stealing" CAM's profits. Instead,

the Joint Venture, in an action brought derivatively by CAM, sought conversion of the *entire* $3.1 million that the federal government paid to Bush over the course of the SAFB project.

¶ 81 Money may be the subject of conversion if it is specifically identifiable chattel. *In re Thebus*, 108 Ill. 2d 255, 260 (1985). "The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." *General Motors Corp. v. Douglass*, 206 Ill. App. 3d 881, 886 (1990) (citing *In re Thebus*, 108 Ill. 2d at 259). But the plaintiff's "right to immediate possession" must be "absolute[ ] and unconditional[ ]." *Wei Quan v. Arcotech Uniexpat, Inc.*, 2018 IL App (1st) 180227, ¶ 12. "It must be shown that the money 'at all times belonged to the plaintiff and that the defendant converted it to his own use.' " *Kovac v. Barron*, 2014 IL App (2d) 121100, ¶ 97 (quoting *In re Thebus*, 108 Ill. 2d at 260-61).

¶ 82 CAM argues that the court erred because it treated the conversion claim not as a derivative claim but as *CAM's* claim for conversion. To the contrary, the trial court's concern was that the Joint Venture was claiming entitlement to the entire amount of gross revenue from the federal government, when in fact the Joint Venture was never going to keep every penny of the gross revenue. The Joint Venture, like any company, would keep the *net* revenue after accounting for the costs of such things as labor, supplies, subcontractors, and any number of other items going into work on the SAFB project. But the conversion claim did not seek some specified amount of money that would constitute the net revenue amount—it did not account for expenses in any way, instead claiming an absolute, unconditional right to every dollar the federal government paid it, in gross.

¶ 83 There is no question that Bush improperly maintained control over $3.1 million that should have been placed into a joint account per the Joint Venture Agreement. But the Joint Venture cannot lay claim to every single dollar of that money; it cannot possibly show that every

dollar "at all times belonged" to the Joint Venture. See *In re Thebus*, 108 Ill. 2d at 261. So regardless of whether a different claim for relief (a claim for some amount of *net* revenue) may have fared differently, we agree with the trial court that, "at least the way it's been presented to this Court in this trial," the claim for conversion failed.

¶ 84    Having found no error in the judgment directing findings in favor of Bush with regard to either the contract or the conversion counts, we affirm that judgment as well.

¶ 85                                    CONCLUSION

¶ 86    The judgment of the circuit court is affirmed.

¶ 87    Affirmed.

---

**No. 1-20-0587**

---

| | |
|---|---|
| **Cite as:** | *Chicago Architectural Metals, Inc. v Bush Construction Co.*, 2022 IL App (1st) 200587 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-CH-15082; the Hon. Eve M. Reilly, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Richard Gilbaugh, of Jeffrey Strange and Associates, of Wilmette, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Andrew Manno, of Cray Huber Horstman Heil & VanAusdal LLC, of Chicago, and Jason J. O'Rourke, of Lane & Waterman LLP, of Davenport, Iowa, for appellee. |

---